# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————
                                          )
STAN LEE,                                 )
                                          )        **02 CV 8945 (RWS)**
                    *Plaintiff,*          )        **ECF Case**
                                          )
         - against -                      )
                                          )
MARVEL ENTERPRISES, INC. and MARVEL )
CHARACTERS, INC.,                         )
                                          )
                    *Defendants.*         )
                                          )
                                          )
                                          )
———————————————————————

**AFFIRMATION OF LUKE A. McGRATH**
**IN SUPPORT OF MOTION TO INTERVENE AND UNSEAL RECORDS**

        My name is LUKE A. McGRATH and I hereby affirm under penalty of perjury, pursuant

to 28 U.S.C. § 1746, as follows:

1.      I am an attorney at law, admitted to this Court and a partner of the law firm of

Dunnintgon, Bartholow and Miller LLP, attorneys for Stan Lee Media, Inc. ("SLMI").

2.      I have personal knowledge of the facts set forth below, except as otherwise noted.

3.      I submit this affirmation in support of SLMI's Motion to Intervene and to Unseal

Records.

4.      Attached hereto as **Exhibit A** is a true and correct copy of the Complaint and Answer

filed in *Lee v. Marvel*, Case No. 02-CV-8945 (RWS), ("Ex. A, Lee's Complaint and Marvel's

Answer").

5.      Attached hereto as **Exhibit B** is a true and correct copy of this Court's Order, dated

January 17, 2005, in *Lee v. Marvel*, Case No. 02-CV-8945 ("Ex. B, January 17, 2005 Order").

6.      Attached hereto as **Exhibit C** is a true and correct copy of certain Excerpts from SLMI's Form 10KSB filed with the SEC in March 2000 ("Ex. C, Excerpts from SLMI Form 10KSB, March 2000").

7.      Attached hereto as **Exhibit D** is a true and correct copy of U.S. Copyright Office Recordation Vol. 3544, Document 426 (Nov. 29, 2006) ("Ex. D, SLMI Recordation").

8.      Attached hereto as **Exhibit E** is a true and correct copy of the SEC Order Initiating Proceeding, Admin. Proc. File No. 3-11584 (August 11, 2004) ("Ex. E, SEC Order 1").

9.      Attached hereto as **Exhibit F** is a true and correct copy of SEC Order Making Findings and Imposing Remedial Sanction By Default, Admin. Proc. File No. 3-11584 (September 14, 2004) ("Ex. F, SEC Order 2").

10.     Attached hereto as **Exhibit G** is a true and correct copy of the Colorado Secretary of State, History and Documents for Stan Lee Media, Inc., (indicating that Colorado changed SLMI's status to dissolved in March 2002 and the Company was administratively dissolved on August 1, 2002) ("Ex. G, Colorado Secretary of State Dissolution").

11.     Attached hereto as **Exhibit H** is a true and correct copy of the Order and Entry of Judgment in Bankruptcy Case, Case No. 01-SV-11329KL, (entered December 6, 2006) ("Ex. H, Bankruptcy Dismissal").

12.     Attached hereto as **Exhibit I** is a true and correct copy of Docket Sheet, Case No. 02-CV-8945, *Stan Lee v. Marvel Enterprises, Inc. and Marvel Characters, Inc.* ("Ex. I, Docket Sheet").

13.     Attached hereto as **Exhibit J** is a true and correct copy of the Order, dated May 27, 2010, of the Colorado Court of Appeals, *P.F.P. Family Holdings, L.P. v. Stan Lee Media, Inc.*, Case No. 09-CA-0899, Col. Crt. App. ("Ex. J, Colorado Order").

14.     Attached hereto as **Exhibit K** is a true and correct copy of the Amended Verified

Derivative Complaint, Case No. 09-CV-0715, dated April 27, 2009 ("Ex. K, SDNY Verified

Derivative Complaint").

15.     Attached hereto as **Exhibit L** is a true and correct copy of the proposed Second Amended

Verified Derivative Complaint, Case No. 09-CV-0715, dated September 8, 2009 ("Ex. L,

Proposed Second Amended Verified Derivative Complaint").


        I affirm under penalty of perjury that the foregoing is true and correct.

Executed on July 14, 2010.

                                    _____

                                    Luke A. McGrath

# EXHIBIT L



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOSE ABADIN, CHRISTOPHER BELLAND,
EXCELSIOR PRODUCTIONS, INC., CONTINENTAL
ENTITIES, INC., HOLLYWOOD HOLDINGS
CORPORATION and P.F.P. FAMILY HOLDINGS, L.P.,
derivatively on behalf of STAN LEE MEDIA, INC.,

09 Civ. 0715 (PAC)

**VERIFIED SECOND
AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

                                    Plaintiffs,

        -against-

MARVEL ENTERTAINMENT, INC., MARVEL
CHARACTERS, INC., ISAAC PERLMUTTER, AVI
ARAD, STAN LEE, POW! ENTERTAINMENT, LLC.,
POW! ENTERTAINMENT INC., QED PRODUCTIONS,
LLC, ARTHUR M. LIEBERMAN, GILL CHAMPION,
JUNKO KOBAYASHI and KENNETH S. WILLIAMS,

                                    Defendants.

---

        Plaintiffs Jose Abadin, Christopher Belland, Excelsior Productions, Inc., Continental

Entities, Inc., Hollywood Holdings Corporation and P.F.P. Family Holdings, L.P. (together,

"Plaintiffs"), each of which is a shareholder of Stan Lee Media, Inc. ("SLMI"), derivatively, and

independently, on behalf of Stan Lee Media, Inc. ("SLMI"), by their attorneys, Chadbourne &

Parke LLP and Michael D. Hess, as and for their Verified Second Amended Complaint against

defendants, hereby allege as follows:

## NATURE OF THIS ACTION

1.        Through this action, Plaintiffs seek, among other things, to enforce long-standing

contractual obligations made to them by comic book icon Stan Lee, and to put an end to the

corrupt and fraudulent acts taken to loot SLMI.  At issue are the rights to Stan Lee's creative

universe consisting of some of the world's most popular and commercially successful characters

and stories such as Spider-Man, The Incredible Hulk, Iron Man, X-Men and The Fantastic Four.

2.        In 1998, Stan Lee formed Stan Lee Entertainment, Inc. ("SLE"), the predecessor

entity to SLMI, and thereafter conveyed all of his past, present and future intellectual property to

SLMI, and otherwise committed himself to SLMI's success.  Shareholders invested in Stan Lee's

company, which went public in 1999, in reliance upon these obligations.  Thereafter, when SLMI

no longer served his purposes, Stan Lee abandoned SLMI and its shareholders for his own

financial gain, and ignored his contractual obligations.

3.        Stan Lee did not act alone in committing these harmful and unlawful acts.

Recognizing the enormous value of Stan Lee's creations, many powerful players in the

entertainment industry have acted in concert with Stan Lee.  To date, and at great harm to SLMI,

Stan Lee and the other defendants named in this action, have systematically siphoned off SLMI's

assets and diverted them to themselves, and have repeatedly violated the intellectual property

rights belonging to SLMI.

4.        In a final attempt to forever close the door on SLMI's rights, Stan Lee and his cohorts

ultimately caused SLMI to be dissolved and thwarted efforts by SLMI shareholders to seat a new

2

board of directors for the company to enforce its rights. Through this action, plaintiffs seek to vindicate SLMI's rights and finally put an end to defendants' long-standing and egregious wrongdoing.

## THE PARTIES

### The Plaintiffs

5.        Plaintiff Jose Abadin ("Abadin"), an individual shareholder, is a resident of the State of California.

6.        Plaintiff Christopher Belland ("Belland"), an individual shareholder, is a resident of the State of Florida.

7.        Plaintiff Excelsior Productions, Inc. ("Excelsior"), a corporate shareholder, is a Delaware corporation with its principal place of business located within the State of North Carolina.

8.        Plaintiff Continental Entities, Inc. ("Continental"), a corporate shareholder, is a Delaware corporation with its principal place of business located within the State of North Carolina.

9.        Plaintiff Hollywood Holdings Corporation ("Hollywood"), a corporate shareholder, is a Delaware corporation with its principal place of business located within the State of North Carolina.

10.      P.F.P. Family Holdings, L.P. ("Family Holdings"), a limited partnership shareholder, is a California limited partnership whose partners reside in North Carolina.

### The Defendants

3

11.       Upon information and belief, defendant Marvel Entertainment, Inc. ("Marvel

Entertainment") is a Delaware corporation and, at all relevant times described herein, has

regularly conducted business in the Southern District of New York or maintains its principal

place of business in the Southern District of New York.  Marvel Entertainment specializes in the

publication of comic books containing characters, stories, and other types of intellectual property

created or authored by others.  Upon information and belief, Marvel Entertainment is a corporate

successor in interest to Marvel Enterprises, Inc. ("Marvel Enterprises"), a Delaware corporation

which, at all relevant times described herein, has regularly conducted business in the Southern

District of New York or maintains its principal place of business in the Southern District of New

York.  Marvel Enterprises specializes in the publication of comic books containing characters,

stories, and other types of intellectual property created or authored by others.

12.       Upon information and belief, defendant Marvel Characters, Inc. ("Marvel

Characters") is a Delaware corporation and, at all relevant times described herein, has regularly

conducted business in the Southern District of New York or maintains its principal place of

business in the Southern District of New York.  Marvel Characters is the holder of interests in

various characters, stories, and other types of intellectual property (Marvel Entertainment,

Marvel Enterprises and Marvel Characters will be referred to collectively as "Marvel").

13.       Upon information and belief, defendant Isaac Perlmutter ("Perlmutter") is the Vice

Chairman of the Board of Directors for, and Chief Executive Officer of, Marvel Entertainment,

with a residence in the Southern District of New York, who, at all relevant times described

herein, has regularly conducted business in the Southern District of New York and, to the extent

applicable, conducted business outside New York which was intended to or did affect persons

4

and entities in New York or persons and entities having rights and interests in property with a

nexus to New York.

14.      Upon information and belief, defendant Avi Arad ("Arad"), until on or about May 31,

2006, was a Director for, and the Chief Creative Officer of, Marvel Entertainment, with a

residence in California, who, at all relevant times described herein, has regularly conducted

business in the Southern District of New York and, to the extent applicable, conducted business

outside New York which was intended to or did affect persons and entities in New York or

persons and entities having rights and interests in property with a nexus to New York.  Upon

information and belief, since May 31, 2006, Arad is the head of his own entertainment company

called "Avi Arad Productions" and Arad continues to work with and produce entertainment

projects for Marvel.

15.      Upon information and belief, defendant Stan Lee ("Lee") is a director for, officer of,

member or manager of, equity holder in, or principal of defendants POW! Entertainment LLC,

POW! Entertainment, Inc. and QED Productions LLC, with a residence in California, and who, at

all relevant times described herein, has regularly conducted business in the Southern District of

New York and, to the extent applicable, conducted business outside New York which was

intended to or did affect persons and entities in New York or persons and entities having rights

and interests in property with a nexus to New York.

16.      Upon information and belief, defendant POW! Entertainment LLC ("POW LLC") is a

Delaware limited liability company, at least one of whose members (defendant Arthur M.

Lieberman) has a residence in New York, and who, at all relevant times described herein, has

conducted business in the Southern District of New York and, to the extent applicable, conducted

business outside New York which was intended to or did affect persons and entities in New York
or persons and entities having rights and interests in property with a nexus to New York. POW
LLC is the purported holder of interests in various types of intellectual property.

17.    Upon information and belief, defendant POW! Entertainment, Inc. ("POW Inc.," and
together with POW LLC, "POW") is a Delaware corporation and, at all relevant times described
herein, has conducted business in the Southern District of New York and, to the extent
applicable, conducted business outside New York which was intended to or did affect persons
and entities in New York or persons and entities having rights and interests in property with a
nexus to New York. POW Inc. is the purported holder of interests in various types of intellectual
property.

18.    Upon information and belief, defendant QED Productions LLC ("QED") is a
Delaware limited liability company, at least one of whose members (defendant Arthur M.
Lieberman) has a residence in New York, and who, at all relevant times described herein, has
conducted business in the Southern District of New York and, to the extent applicable, conducted
business outside New York which was intended to or did affect persons and entities in New York
or persons and entities having rights and interests in property with a nexus to New York. QED is
the purported holder of interests in various types of intellectual property.

19.    Upon information and belief, defendant Arthur M. Lieberman ("Lieberman")
is a director for, officer of, member or manager of, equity holder in, or principal of POW LLC,
POW Inc. and QED, with a residence in New York, who, at all relevant times described herein,
has acted as Lee's personal attorney or business partner, and who has regularly conducted
business in the Southern District of New York and, to the extent applicable, conducted business

6

outside New York which was intended to or did affect persons and entities in New York or persons and entities having rights and interests in property with a nexus to New York.

20.        Upon information and belief, defendant Gill Champion ("Champion") is a director for, officer of, member or manager of, equity holder in or principal of POW LLC, POW Inc. and QED, with a residence in California, who, at all relevant times described herein, has acted as Lee's business partner, and who has conducted business in the Southern District of New York and, to the extent applicable, conducted business outside New York which was intended to or did affect persons and entities in New York or persons and entities having rights and interests in property with a nexus to New York.

21.        Upon information and belief, defendant Junko Kobayashi ("Kobayashi") is a director for, officer of, member or manager of, equity holder in or principal of POW LLC, POW Inc. and QED, with a residence in California, who, at all times relevant herein, has acted as Lee's business partner, and who has conducted business in the Southern District of New York and, to the extent applicable, conducted business outside New York which was intended to or did affect persons and entities having rights and interests in property with a nexus to New York.

22.        Upon information and belief, defendant Kenneth S. Williams ("Williams") is an advisory consultant for companies and private equity firms in media and entertainment, was a President and Chief Executive Officer of Ascent Media Group (a wholly owned subsidiary of Liberty Media Corporation) commencing on or about October 8, 2003, and was Chief Operating Officer of Ascent Media Group from on or about October, 2002 to October, 2003, and has a residence in California, and who, at all times relevant herein, has acted as Lee's business partner, and who has conducted business in the Southern District of New York and, to the extent

7

applicable, conducted business outside New York which was intended to or did affect persons

and entities having rights and interests in property with a nexus to New York (Champion,

Kobayashi and Williams will be collectively referred to as the "SLMI Officer Defendants").

### JURISDICTION AND VENUE

23.       This Court has jurisdiction over the copyright claims pursuant to 28 U.S.C.

§§ 1331, 1338, 1334, 2201, 2202, the 1976 Copyright Act (17 U.S.C. § 101 et seq.) or the 1909

Copyright Act (17 U.S.C. § 1 et seq.).

24.       This Court has jurisdiction over the trademark and service mark claims pursuant to 28

U.S.C. §§ 1331, 1338, 1334, 2201, 2202 or the Lanham Act (15 U.S.C. § 1121).

25.       This Court has jurisdiction over the preference, avoidance, automatic stay, fiduciary

duty and debtor-in-possession claims arising under, arising in or related to SLMI's bankruptcy

case (as described herein) pursuant to 28 U.S.C. §§ 1331, 1334, 2201 or 2202.

26.       This Court has jurisdiction over the declaratory judgment claims pursuant to 28

U.S.C. §§ 1331, 2201 or 2202, to the extent that such claims are unrelated to (a) the copyright

claims, (b) the trademark and service claims, or (c) the preference, avoidance, automatic stay,

fiduciary duty and debtor-in-possession claims arising under, arising in or related to SLMI's

bankruptcy case.

27.       This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all

claims that are outside the realm of federal question jurisdiction.

28.       Venue over this action is proper in this district pursuant to 28 U.S.C. §§ 1391, 1400,

1401 or other applicable federal laws.

## FEDERAL RULE 23.1 PLEADING REQUIREMENTS

29.    Plaintiffs bring this case as a derivative action pursuant to Rule 23.1 of the Federal Rules of Civil Procedure ("FRCP") on behalf of SLMI and all other shareholders of SLMI that are similarly situated.  Each of the Plaintiffs is a shareholder of SLMI, a Colorado corporation, and each is suing derivatively, and independently, on behalf of SLMI, as a shareholder thereof, in order to enforce SLMI's rights that it is currently unable to assert directly due to the absence of any directors or officers who are legally authorized to act on its behalf.

30.    SLMI is a successor entity to Stan Lee Entertainment, Inc. ("SLE") which was incorporated in the State of Delaware on October 13, 1998.  In January 1999, a Delaware entity named Stan Lee Media, Inc. ("SLMI-DE") was incorporated in the State of Delaware.  In April 1999, SLE merged with SLMI-DE, with SLMI-DE being the surviving entity.  Thereafter, in July 1999, SLMI-DE engaged in a reverse acquisition with a publicly owned and non-operating Colorado corporation, which was renamed "Stan Lee Media, Inc." (SLMI), and SLMI became the current successor in interest to SLE and, SLMI-DE (whose assets have been transferred to SLMI) became a subsidiary of SLMI.

31.    Plaintiffs are each shareholders of SLMI who, independently and collectively, fairly and adequately represent the interests of SLMI's similarly situated shareholders in enforcing SLMI's rights.

32.    Abadin has continuously been a legal or beneficial owner of SLMI stock since December 1999.

33.    Belland has continuously been a legal or beneficial owner of SLMI stock since November 1999.

9

34.        Plaintiffs Excelsior, Continental, Hollywood and Family Holdings (collectively, the

"Original Derivative Shareholders") were each legal or beneficial owners of stock in SLE,

SLMI's then corporate predecessor, prior to November 17, 1998, the date on which Lee and

Marvel executed a written agreement pursuant to which Lee purportedly granted a conditional

assignment of various intellectual property to Marvel, as further set forth below. Therefore, for

all transactions occurring on November 17, 1998 or thereafter, the applicable FRCP 23.1 rules

are satisfied.

35.        Each of the Plaintiffs was a legal or beneficial owner of stock in SLMI prior to

November 12, 2002, the date on which the November 17, 1998 agreement was publicly disclosed

in a complaint filed by Lee against Marvel, as further set forth below. Therefore, for all

transactions occurring on November 12, 2002 or thereafter, the applicable FRCP 23.1 rules are

satisfied.

36.        This case is not a collusive one to confer jurisdiction that the Court would otherwise

lack.

37.        There is no legally authorized director to whom Plaintiffs, as shareholders of SLMI,

can make a demand to pursue a direct action for SLMI's rights, and any such demand would be

futile or is otherwise excused for the following reasons:

        (a)      Currently, SLMI has no board of directors endowed with legal authority to act

               on behalf of SLMI. This "rudderless" status is attributable to Lee and the

               SLMI Officer Defendants who caused the administrative dissolution of SLMI

               in 2002 during the pendency of SLMI's bankruptcy case, which was

commenced on February 16, 2001 and dismissed on November 14, 2006, in

the United States Bankruptcy Court for the Central District of California.

(b)     Lee and the SLMI Officer Defendants caused the State of Colorado to place

SLMI into the legal status of an "administratively dissolved" corporation

under Colorado law, such that, upon the November 14, 2006 dismissal of

SLMI's bankruptcy case, there was no board of directors endowed with legal

authority to act on SLMI's behalf.

(c)     Since SLMI's bankruptcy case was dismissed, Plaintiffs have, both

individually or collectively, attempted to cause a board of directors to be

seated for SLMI through various Colorado State court proceedings.

(d)     However, Lee, Kobayashi and others have engaged in an aggressive and

continuing attempt to prevent any board of directors from being seated.

(e)     For instance, in connection with the Colorado State court proceedings,

Plaintiffs have, on several occasions, proposed a slate of board of directors

for SLMI to enforce SLMI's rights.  Lee, Kobayahsi and others did not

propose a competing slate of board of directors.  Instead, they strenuously

objected to (i) Plaintiffs' efforts to obtain a legally sufficient quorum for

purposes of voting on a slate of board of directors, and (ii) Plaintiffs' efforts

to obtain a court order confirming the election of a slate of board of directors

once Plaintiffs had obtained a legally sufficient quorum.

(f)     In or around May 2008, Plaintiffs finally succeeded in obtaining a Colorado

State court order confirming the election of a slate of board of directors

11

pursuant to a legally sufficient quorum. However, shortly thereafter, Lee, Kobayashi and others took actions which resulted in the issuance of an <u>ex parte</u> order, without an opportunity for Plaintiffs to be heard on the merits, from a different judge in Colorado unseating the newly-installed board of directors.

(g)    Due to the circumstances, Plaintiffs had no choice but to file a new petition, to yet another judge in Colorado, seeking again to seat a board of directors.

(h)    Unfortunately, once again, Lee, Kobayashi and others strenuously objected to Plaintiffs' efforts to seat a board of directors for SLMI in connection with the Colorado State court proceedings.

(i)    As of the date of this Second Amended Complaint, the Colorado State governance proceedings have not yet proceeded to a point at which another court order has issued confirming the election of a slate of board of directors. Plaintiffs intend to continue their efforts.

38.    As of the date of this Second Amended Complaint, SLMI has no board of directors endowed with legal authority to act on behalf of SLMI, and, therefore, there is no legally authorized director to whom Plaintiffs, as shareholders of SLMI, can make a demand to pursue a direct action for SLMI to enforce SLMI's rights, and any such demand would be futile or is otherwise excused.

39.    Pursuant to the foregoing, and until such time as an order is issued by a court of competent jurisdiction confirming the election of a board of directors for SLMI to enforce

SLMI's rights directly, Plaintiffs, as shareholders of SLMI, are each suing derivatively and independently on behalf of SLMI to enforce SLMI's rights.

## FACTUAL BACKGROUND

### Prior to 1994, Lee Creates an Empire of Characters and Stories on a Freelance Basis

40.        In 1941, while he was still a teenager, Stan Lee's first creation -- the text filler "Captain America Foils the Traitor's Revenge" in Captain America Comics #3 (May 1941) -- was published by a comic book publisher known as "Timely Comics."

41.        Over the next half century, Lee's creative genius resulted in Lee's conception, creation, authorship and development of a cavalcade of comic book characters and stories, many of which have become world famous.

42.        In 1941, Lee began to work as an office assistant at Timely Comics. Thereafter, at different points in time over the next half century, Lee had "job titles" at Timely Comics, Atlas Comics, Marvel Comics and elsewhere, such as "interim editor," "art director" and "publisher."

43.        Prior to November 17, 1998, Lee did not execute a written agreement with Marvel (or its predecessor entities) purporting to divest Lee of his ownership of his creations, characters and stories. However, on October 20, 1998, Lee executed a written agreement, made effective as of October 15, 1998, assigning and conveying all of Lee's right, title and interest to all of his creations, characters and stories to SLMI.

44.        Upon information and belief, prior to January 1, 1978, Marvel did not "employ" Lee as a "writer" or "artist" and Lee's job duties for Marvel did not involve the creation of characters or stories in the regular scope of his "employment" at the "instance" and "expense" of Marvel.

Upon information and belief, Lee did not create any "works" for Marvel as a "work for hire" (in the manner required under the 1976 Copyright Act, 17 U.S.C. § 101, et seq.) during the period from January 1, 1978 through October 14, 1998. Rather, Lee conceived of, created, authored and developed his creations, characters and stories, independently and mainly at his home on nights and weekends on a freelance basis outside of the regular scope of his "employment" for Marvel. Lee allowed Marvel and others to use and publish Lee's creations, characters and stories. Indeed, Lee has acknowledged that when he was at Marvel's office he acted as an "editor" and "art director" where he told staff what to do, whereas, at home and elsewhere, he was writing and creating.

45.        Lee has acknowledged that he completed the creation of his most popular character --Spider-Man -- after being explicitly told by the then owner and chairman of Marvel that Marvel did not want the Spider-Man character and would not publish it.

46.        Lee received separate payments on a "per script" basis, whether from Marvel or others, for his characters and stories that he created, authored and developed. In fact, Lee has publicly indicated that anytime he needed more money, he would write more scripts and shop them to interested publishers.

47.        The comic books published by Marvel (or its predecessors), which contain Lee's characters and stories, were registered by Marvel (or its predecessors) as copyrighted works and trademarks with the United States Copyright Office and the United States Patent and Trademark Office (the "USPTO"), respectively. Such registrations inured to the benefit of Lee and did not extinguish or destroy Lee's ownership rights and interests in his creations, characters and storie, nor did such registrations constitute a transfer of Lee's ownership rights and interests to Marvel.

14

48.        Based upon the foregoing, Lee's creations, characters, stories and related intellectual

property were not "works for hire" or commissioned works for Marvel.  Rather, Lee retained

ownership of his creations, characters, stories and related intellectual property.

49.        Indeed, Marvel has continuously recognized Lee's ownership interest in his creations

by, among other things, referencing Lee's rights in its publications by using language such as

"based upon the character created by Stan Lee," and subsequently entering into a written

employment contract with Lee on November 17, 1998, recognizing Lee's ownership interests in

his characters.

50.        Thus, beginning in 1941 and continuing until approximately April 1994, while

writing and creating on a freelance and independent basis outside the regular scope of his

"employment" for Marvel, and for a separate project-by-project fee, Lee conceived of, created,

authored and developed his creations, characters, stories and related intellectual property.  In the

process, Lee built a brand name for himself, independent of Marvel, and is widely recognized as

a creator and author of some of the world's most popular and commercially successful characters

and stories, including but not limited to the following:

       (1)    Spider-Man;
       (2)    The Fantastic Four;
       (3)    Mr. Fantastic;
       (4)    The Invisible Woman;
       (5)    Human Torch, a/k/a Johnny Storm;
       (6)    The Thing;
       (7)    The Incredible Hulk;
       (8)    X-Men;
       (9)    Daredevil;
       (10)   Silver Surfer;
       (11)   Ant-Man, a/k/a Yellowjacket, Giant-Man, Goliath;
       (12)   Iron Man;
       (13)   Doctor Strange;

(14)   The Avengers;
(15)   Thor;
(16)   Doctor Doom;
(17)   Magneto;
(18)   Colonel Nicholas Joseph "Nick" Fury;
(19)   Galactus;
(20)   Green Goblin;
(21)   Doctor Octopus;
(22)   The Vulture;
(23)   Mysterio;
(24)   John Jonah Jameson, a/k/a J. Jonah Jameson, J.J., and J.J.J;
(25)   The Lizard;
(26)   The Rhino;
(27)   The Shocker;
(28)   Mary Jane, a/k/a Mary Jane Watson-Parker;
(29)   Gwen Stacy;
(30)   The Sandman;
(31)   Electro;
(32)   Kraven the Hunter;
(33)   MACH-IV, a/k/a Beetle, MACH-1, 2 and 3;
(34)   The Chameleon;
(35)   Boomerang;
(36)   Blacklash a/k/a Whiplash;
(37)   Kingpin;
(38)   Baron Wolfgang von Strucker;
(39)   Mentallo;
(40)   Fixer;
(41)   Hawkeye;
(42)   Wonderman;
(43)   The Wasp;
(44)   Scarlet Witch;
(45)   Quicksilver;
(46)   Odin;
(47)   The Absorbing Man;
(48)   Mangog;
(49)   Ulik;
(50)   Fandral, a/k/a Fandral the Dashing;
(51)   Hogan, a/k/a Hogun the Grim;
(52)   Volstagg;
(53)   Balder the Brave;
(54)   Skurge, The Executioner;
(55)   Enchantress;
(56)   The Mandarin;

16

(57)   Power Man, a/k/a Atlas, Smuggler, Goliath, Erik Josten;
(58)   Black Bolt;
(59)   Medusa;
(60)   Karnak;
(61)   Gorgan;
(62)   Triton;
(63)   Crystal;
(64)   Lockjaw;
(65)   Maximus, a/k/a Maximus the Mad;
(66)   The Inhumans;
(67)   The Skrulls;
(68)   Captain Marvel, a/k/a Captain Mar-vell;
(69)   Toad;
(70)   Mastermind;
(71)   Blob;
(72)   Cyclops;
(73)   Marvel Girl, a/k/a Jean Grey, Phoenix;
(74)   Iceman;
(75)   Angel, a/k/a Archangel, Warren Kenneth Worthington III; and
(76)   Beast.

(these characters, together with all other characters, stories, creations and intellectual property conceived, created, authored or developed by Lee prior to April 1994 will be referred to collectively as the "Pre-1994 Characters").

**In April 1994, Lee and Marvel Enter Into a Short-Lived
Employment Agreement Which Does Not Address, Much Less
Divest, Lee of His Ownership of the Pre-1994 Characters**

51.    On April 1, 1994, Marvel and Lee executed a written employment agreement (the "1994 Agreement").

52.    The 1994 Agreement provides that (a) Lee would thereafter work for Marvel "for life" on the compensation terms set forth therein; and (b) any future characters to be subsequently created by Lee would be deemed to constitute "works for hire" to be owned by Marvel.

53.    The 1994 Agreement does not address, much less divest, Lee of his ownership of the Pre-1994 Characters. Indeed, the 1994 Agreement is silent with respect to the nature and extent

of ownership rights and interests in the Pre-1994 Characters. Accordingly, the 1994 Agreement
(a) does not terminate or extinguish Lee's ownership interests in his Pre-1994 Characters and (b)
has no effect on the legal relationship between Lee and Marvel regarding Lee's ownership of his
Pre-1994 Characters.

54.        The term of this 1994 Agreement between Lee and Marvel was short-lived. On
or about December 27, 1996, Marvel filed a petition for relief under Chapter 11 of Title 11 of the
United States Code ("the Bankruptcy Code") in the United States Bankruptcy Court for the
District of Delaware (the "Marvel Bankruptcy").

55.        On or about July 30, 1998, the United States Bankruptcy Court for the District of
Delaware issued an order approving a plan of reorganization in the Marvel Bankruptcy (the
"Reorganization Order"). Pursuant to the Reorganization Order, the terms and provisions of the
reorganization plan went into full force and effect. One of those terms was a rejection by Marvel
of the executory portions of the 1994 Agreement.

56.        Upon information and belief, during the time that the 1994 Agreement was in effect -
- from on or about April 1, 1994 to on or about July 30, 1998 -- Lee did not create any new
characters for Marvel that are governed by the 1994 Agreement. Accordingly, while the 1994
Agreement was in effect, Marvel did not acquire any ownership rights in Lee's Pre-1994
Characters, or any ownership rights in any other Lee creations, characters, stories and related
intellectual property.

57.        Indeed, Marvel's use and publication of Lee's Pre-1994 Characters pursuant to an
unwritten relationship between Lee and Marvel - - whether before, during or after the short-lived
term of the April 1994 Agreement - - (a) does not confer any ownership rights on Marvel in Lee's

18

Pre-1994 Characters and (b) has been governed by the terms of an implied nonexclusive license

between Lee (as owner and licensor of the Pre-1994 Characters) and Marvel (as licensee of the

Pre-1994 Characters).

**Lee Creates SLMI Following Marvel's Rejection of the 1994
Agreement, In Order to Compete Head-On with Marvel**

58.          Shortly after Marvel's rejection of the 1994 Agreement became effective (on or about

July 30, 1998), Lee together with Lieberman (Lee's lawyer and future business partner) and

others caused SLE, SLMI's predecessor, to be incorporated in Delaware on October 13, 1998.  In

July 1999, SLMI became the current successor in interest to SLE.

59.          On October 20, 1998, Lee and SLE executed a written employment and assignment

agreement, made effective as of October 15, 1998 (the "SLE/SLMI Assignment").  Pursuant to

the SLE/SLMI Assignment, Lee assigned and conveyed all of his ownership rights and

intellectual property rights from throughout the creative universe, inclusive of the Pre-1994

Characters and all of Lee's other creations, characters, stories and related intellectual property

rights, to SLE in connection with Lee's then-existing, thereafter-arising or thereafter-created

creations, characters, stories and related intellectual property.

60.          Specifically, the SLE/SLMI Assignment states, in pertinent part, as follows:

> 4.(a)  I [Stan Lee] assign, convey and grant to [SLE] forever, all right, title and
> interest I may have or control, now or in the future, in the following:  Any and all
> ideas, names, titles, characters, symbols, logos, designs, likenesses, visual
> representations, artwork, stories, plots, scripts, episodes, literary property, and the
> conceptual universe related thereto, including my name and likeness (**the
> "Property"**) which will or have been in whole or in part disclosed in writing to,
> published, merchandised, advertised, and/or licensed by [SLE] its affiliates and
> successors in interest and licensees (which by agreement inures to [SLE's] benefit) or

19

any of them <u>and</u> <u>my copyrights, trademarks, statutory rights, common law, goodwill,</u> <u>moral rights and any other rights whatsoever in the Property</u> in any and all media and/or fields, including all rights to renewal or extensions of copyright <u>and make</u> <u>applications or institute suits therefor</u> (**the "Rights"**).

* * *

4.(c)  Subject to a material breach of this agreement, <u>I will never file</u> with the U.S. Copyright or Patent and Trademark Office or any governmental or public agency, <u>and</u> <u>will never assert or assist others in asserting on my behalf</u> **or in claiming rights** **through me,** <u>any claim to ownership of the Rights in the Property, or in making any</u> <u>objection</u> to [SLE's] complete and unrestricted right to use and exploit said Property or Rights in any manner or medium [SLE] may desire.

5.  This Agreement, including the assignment set forth herein, shall be binding upon the parties hereto, their affiliates and subsidiaries, legal representatives, successors and predecessors in interest, heirs and assigns.

(<u>emphasis</u> <u>added</u>; the Property and Rights, as defined in the SLE/SLMI Assignment, will be

referred to collectively as the "IP Assets").

61.      At the time that Lee executed the SLE/SLMI Assignment, Lee was not a party to any

then-effective written agreement with Marvel concerning any of the IP Assets.

62.      At the time that Lee executed the SLE/SLMI Assignment, Lee was the owner of the

IP Assets, including but not limited to all of Lee's Pre-1994 Characters, and Lee had the right and

authority to assign and convey ownership of the IP Assets to SLE.

63.      In accordance with one of the terms of the SLE/SLMI Assignment, the "Property" (as

defined thereunder) has already been "disclosed in writing to, published, merchandised,

advertised, and/or licensed by [SLE] its affiliates and successors in interest and licensees (which

by agreement inures to [SLE's] benefit) or any of them" in various ways, including but not

limited to the fact that the "Property" (as defined in the SLE/SLMI Assignment), among other

things, has already been (a) "licensed by SLE," (b) "licensed by" Marvel, as SLE's licensee,

20

during the period from on or about October 15, 1998 to on or about July 1999, (c) "licensed by"

SLMI and (d) "licensed by" Marvel, as SLMI's "licensee," during the period from on or about

July 1999 and thereafter.

64.      In addition, through the SLE/SLMI Assignment, Lee also independently assigned and

conveyed all of his then-existing, or after-arising, "Rights" (as defined thereunder) as constituting

all "copyrights, trademarks, statutory rights, common law [rights], goodwill [rights], moral rights

and any other rights whatsoever in the Property in any and all media and/or fields, including all

rights to renewal or extensions of copyright and make applications or institute suits therefore,"

without any requirement that such "Rights," unlike the "Property," "will or have been in whole or

in part disclosed in writing to, published, merchandised, advertised, and/or licensed by [SLE] its

affiliates and successors in interest and licensees (which by agreement inures to [SLE's] benefit)

or any of them."

65.      SLE, and its successors in interest, conveyed to Lee a majority interest in the

common stock of SLE, together with the other consideration set forth in the SLE/SLMI

Assignment, in return for Lee's assignment and conveyance to SLE of all of Lee's ownership

rights, and other intellectual property rights of any kind, with respect to Lee's past, present and

future creations, characters, stories and related intellectual property and, among other things,

SLE's right to "make applications or institute suits therefore."

66.      Upon information and belief, Lee continues to own and control shares in SLE, which

were thereafter converted to SLMI shares, that were issued to him and has never tendered them

back to SLE or SLMI.

21

67.    Pursuant to the SLE/SLMI Assignment, SLE, and SLMI thereafter, are obligated to pay Lee an annual salary of $250,000 plus bonuses, expenses, fringe benefits and insurance. SLE, and SLMI thereafter, have fully performed all of their obligations under the SLE/SLMI Assignment or, alternatively, to the extent it may be applicable, SLE and SLMI thereafter have been precluded from doing so by the wrongful acts of Lee and certain defendants acting in tandem with Lee.

68.    The SLE/SLMI Assignment not only assigns and conveys the IP Assets to SLE, but also contains a separate and independent employment agreement whereby Lee agreed to work exclusively for SLE for life with one stated exception allowing Lee to provide up to 10-15 hours per week of services to Marvel. This carve-out enables Lee to give speeches and interviews on behalf of Marvel, and to consult with and supervise Marvel regarding its operations, on a limited, part time basis but does not authorize Lee, in any way, to violate SLE's ownership rights to the IP Assets or Lee's contractual obligations to SLE.

69.    The SLE/SLMI Assignment provides, subject to this limited carve-out, that SLE is entitled to the benefits and proceeds of all other services performed by Lee, and all intellectual property then held or to be created by Lee, whether directly for SLE and/or for any other entity.

70.    The SLE/SLMI Assignment provides, subject to this limited carve-out, that Lee is required to obtain the written consent of SLE prior to performing any services of any kind for any other entity.

71.    At no point in time has SLE or SLMI ever provided Lee with any form of written consent authorizing Lee to perform any services of any kind for any other entity, except to the

extent set forth in the written agreements attached to SLMI's Form 10KSB filed with the SEC on
or about March 20, 2000.

72.        As SLMI is the current successor in interest to SLE, SLMI is the rightful owner and
holder of the IP Assets assigned by Lee to SLE pursuant to the SLE/SLMI Assignment.

73.        In October 1999, approximately one year after the date of execution of the SLE/SLMI
Assignment, Lee executed an amendment (the "1999 Amendment") which
(a) ratifies and confirms the validity of the SLE/SLMI Assignment as remaining in full force and
effect, except for one aspect of Lee's compensation rights (which were reduced therein) and (b)
does not affect any provisions related to the assignment and conveyance of the IP Assets to
SLMI.

74.        The 1999 Amendment contained express representations by Lee that such instrument
was being signed by him after consultation with his financial consultants and legal counsel and
expressly references SLMI as the successor in interest to SLE.

75.        Except for the limited scope of the 1999 Amendment, which does not affect any
provisions related to the assignment and conveyance of the IP Assets to SLMI, the SLE/SLMI
Assignment has never been modified and remains in full force and effect in accordance with its
terms.

76.        Upon information and belief, at all times relevant herein, defendants Marvel,
Perlmutter, Arad and Lieberman knew about the creation, existence and effect of the SLE/SLMI
Assignment and knew that, as of November 17, 1998, Lee was not authorized to dispose of the IP
Assets, including his original rights to and interests in the Pre-1994 Characters, to anyone

23

because Lee had already assigned and conveyed the IP Assets to SLE, as of October 15, 1998, by virtue of the SLE/SLMI Assignment.

77.     Upon information and belief, the SLMI Officer Defendants were, at all times relevant herein, under Lee's control, and such SLMI Officer Defendants include the following defendants:

      (a)     Lee served as SLMI's Chairman of the Board of Directors and Chief Creative Officer from on or about October 15, 1998 until on or about November 14, 2006;

      (b)     Champion served as SLMI's Chief Operating Officer from on or about July 1999 until on or about November 14, 2006;

      (c)     Kobayashi served as SLMI's Controller and Secretary from on or about January 2000 until on or about November 2006; and

      (d)     Williams served as SLMI's Chief Executive Officer from on or about January 2006 until November 14, 2006.

**After Executing The SLE/SLMI Assignment, Lee Creates
New Characters And Other Intellectual Property**

78.     Beginning on October 15, 1998, Lee, while employed by SLMI, created certain characters, copyrights, trademarks, and other intellectual property which, by the express terms of the SLE/SLMI Assignment, belong to and are owned by SLMI (the "Post-1998 Characters").

79.     Upon information and belief, the Post-1998 Characters created by Lee, after he executed the SLE/SLMI Assignment, include but are not limited to the following:

      (1)     Stanlee.NET website and portal
      (2)     The Accuser
      (3)     The Drifter

(4)    Stan's Evil Clone
(5)    Chrysallis
(6)    The Stone Giant
(7)    Battle School Tranquility
(8)    Lee Schultz Partnership
(9)    DC Comics/Stan Lee Project
(10)   Scuzzle Project and Scuzzle Design Project
(11)   7th Portal

80.    Upon information and belief prior to October 15, 1998, any use by Marvel of Lee's

trademarks and other intellectual property, including the Pre-1994 Characters, was done with

Lee's permission, in exchange for compensation to be paid to Lee, but not pursuant to the terms

of a written agreement executed by Lee and Marvel.  Such unwritten arrangement amounted to

an implied nonexclusive license between Lee (as licensor) and Marvel (as licensee).  As a

licensee, Marvel's use of the Pre-1994 Characters inures to the benefit of Lee, as the owner,

under the federal trademark laws and, where applicable, the federal copyright laws.  When Lee

assigned and conveyed all of his right, title and interest in the IP Assets to SLE, SLE (and

thereafter SLMI as SLE's successor in interest) stepped into Lee's shoes, as owner of the IP

Assets and as licensor of the IP Assets to Marvel under an implied nonexclusive license.

Marvel's continued use of the IP Assets, including but not limited to the trademarks, inure to the

benefit of SLE (and thereafter SLMI as SLE's successor in interest), as the owner thereof, under

the federal trademark laws and, where applicable, under the federal copyright laws.

**Lee And Marvel Execute An Agreement On November 17, 1998**

81.    Upon information and belief, Lieberman together with Marvel and its key principals

at the time (defendants Perlmutter and Arad) sought to exploit the valuable IP Assets for their

own gain and, therefore, they induced Lee to execute an agreement with Marvel on November

25

17, 1998 (the "Marvel Agreement") whereby Lee purported to convey to Marvel, conditionally, the very same IP Assets that Lee had already transferred, assigned and conveyed to SLE one month earlier by virtue of the SLE/SLMI Assignment.

82.     The Marvel Agreement does not divest SLE (or SLMI as SLE's successor in interest) of its ownership of the IP Assets, as of October 15, 1998, under the SLE/SLMI Assignment.

83.     Upon information and belief, at the time that the Marvel Agreement was executed, Marvel, Perlmutter, Arad and Lieberman had actual and/or constructive knowledge of the SLE/SLMI Assignment, and were aware that SLMI was the owner of the IP Assets and Lee was not authorized to transfer or dispose of the IP Assets.

84.     Moreover, the SLE/SLMI Assignment was publicly disclosed on or about March 20, 2000 when SLMI filed a Form 10-KSB Report with the Securities and Exchange Commission ("SEC"), which Lee signed as Chairman of the Board of SLMI, disclosing that Lee had assigned and conveyed all of his intellectual property rights to SLE by virtue of the SLE/SLMI Assignment (the "SLMI SEC Filing"). In fact, the SLE/SLMI Assignment and the 1999 Amendment were attached to, and incorporated into, the SLMI SEC filing.

85.     Despite Marvel's actual and/or constructive knowledge of the SLE/SLMI Assignment, Marvel did not plainly and expressly repudiate SLMI's ownership interest in the IP Assets until after a group of SLMI shareholders, who are not aligned-in-interest with Lee, brought suit against Marvel in 2007 in this Court, which they were only permitted to do after the dismissal of the SLMI Bankruptcy on or about November 14, 2006, seeking to enforce SLMI's rights to the IP Assets.

86.     Marvel and Lee, aided and abetted by Perlmutter, Arad and Lieberman, concealed the Marvel Agreement from Marvel's creditors and Marvel's shareholders, and from SLMI's creditors and SLMI's shareholders, for approximately four years after Marvel and Lee executed the Marvel Agreement.

87.     At the time that Lee entered into the Marvel Agreement, SLE's independent creditors and SLE's independent shareholders had no knowledge of that agreement and did not know that Lee had purportedly attempted to transfer ownership of the IP Assets to Marvel.

88.     Indeed, as set forth more fully below, the first time that the existence of the Marvel Agreement was disclosed in a publicly filed document was in November 2002 when Lee sued Marvel in this Court for damages under that agreement.

89.     Upon information and belief, the Marvel Agreement has not been recorded with the United States Copyright Office or the USPTO.

90.     Upon information and belief, after the Marvel Agreement was executed, Marvel, Perlmutter, Arad and Lieberman caused monies and other consideration to be paid to or for the benefit of Lee that rightfully belongs to SLMI, SLMI's creditors and SLMI's shareholders.

**Lee Attempts To Terminate The SLE/SLMI Assignment
And Causes The Bankruptcy And Dissolution of SLMI**

91.     On or about January 30, 2001, Lee, aided and abetted by Lieberman, directed and caused a purported "termination letter" to be sent to the then Chief Executive Officer of SLMI, defendant Williams.

92.     Through this letter, Lee and Lieberman attempted to unilaterally terminate the SLE/SLMI Assignment.

93.        Just sixteen days later, on February 16, 2001, Lee, aided and abetted by the SLMI

Officer Defendants, caused SLMI and its wholly-owned subsidiary SLMI-DE to file petitions for

relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

Central District of California, Case No. SV-01-11331-KL (the "SLMI Bankruptcy") which was

jointly administered with Case No. SV-01-11329-KL (the "SLMI-DE Bankruptcy") (collectively,

the SLMI Bankruptcy and the SLMI-DE Bankruptcy are referred to herein as the "SLMI

Bankruptcy").

94.        Since Lee, at the time of the unilateral "termination letter" and for at least one year

prior thereto was an "insider" of SLMI (as that term is defined in the federal bankruptcy code) by

virtue of Lee's status, inter alia, as Chairman of SLMI's Board of Directors and a large

shareholder -- and since the unilateral "termination letter" purports to effectuate a "transfer" (as

that term is defined in the federal bankruptcy code) to Lee of SLMI's ownership and related

property rights in the IP Assets within one year prior to the filing of the SLMI Bankruptcy -- the

unilateral "termination letter" is void, and of no force or effect, under federal bankruptcy law.

95.        The unilateral "termination letter" also is invalid for other independent reasons.  For

instance, pursuant to the statutory requirements of the 1976 Copyright Act, ownership of

copyrights cannot be acquired except through the owner's execution of an appropriate written

agreement assigning and conveying ownership of such copyrights in return for consideration.

The unilateral "termination letter" is not executed by SLMI, and no consideration was given to

SLMI under the "termination letter."  Therefore, the "termination letter" is void, and of no force

or effect, under the federal copyright law.

96.        The unilateral "termination letter" also is invalid for other independent reasons under applicable state law, including but not limited to the fact that (a) SLMI was not in "material breach" of the SLE/SLMI Assignment and (b) Lee's right or remedy for a purported "material breach" off the SLE/SLMI Assignment (which "material breach" did not exist) due to purported nonpayment of sums purportedly owed under the SLE/SLMI Assignment (and no sums were owed to Lee under the SLE/SLMI Assignment) was to commence a lawsuit seeking to establish his purported claim for a judgment for the amount claimed, but Lee did not have a right or remedy to claim unilaterally that the SLE/SLMI Assignment had purportedly been "terminated" so as to "revest" ownership of the IP Assets in Lee.

97.        Indeed, SLMI did not owe any money to Lee, as of January 30, 2001, under the SLE/SLMI Assignment, as corroborated by a filing in the SLMI Bankruptcy which states as follows: "Creditor #178 Arrearages re employment contract for services as Chairman and Chief Exec Amount of Claim $0."

98.        Moreover, the effect of any purported "termination" of the employment provisions under the SLE/SLMI Assignment would not be effective as to the separate and independent assignment provisions of the SLE/SLMI Assignment, pursuant to which an assignment of the IP Assets had taken place effective as of October 15, 1998, as SLMI had never executed a written agreement assigning the IP Assets back to Lee and the SLE/SLMI Assignment does not provide for a "reversion" of ownership of the IP Assets to Lee.

99.        At all times during the pendency of the SLMI Bankruptcy, Lee, along with the SLMI Officer Defendants, (a) controlled, and had the right to control, SLMI and (b) operated, and had the right to operate, SLMI.

29

100.      At all times during the pendency of the SLMI Bankruptcy, Lee and the SLMI Officer

Defendants, as directors and officers of SLMI, owed fiduciary duties to SLMI, and had a duty to,

among other things, truthfully, completely and accurately disclose to the bankruptcy court any

and all potential assets of SLMI that might be subject to the administration of the bankruptcy

court, to protect SLMI's assets for the benefit of its creditors and shareholders, and to act with

candor at all times when making submissions to the bankruptcy court and SLMI's creditors and

shareholders.

101.      Lee, aided and abetted by the SLMI Officer Defendants, failed to truthfully,

completely and accurately disclose the full and complete nature and existence of SLMI's assets to

the bankruptcy court, by, among other things, intentionally misrepresenting the true value of

SLMI's assets to the bankruptcy court and intentionally causing inaccurate and deceitful

submissions to be filed with the bankruptcy court.

102.      After causing SLMI to file for bankruptcy, Lee, aided and abetted by the SLMI

Officer Defendants, attempted to sell some of the partial assets that had been disclosed to an

entity named SLC, LLC ("SLC"), a company to be formed and used by Lee and others to raise

funds that SLC would pay to SLMI's bankruptcy estate for allocation to SLMI's creditors (and, if

all creditors were paid, the excess would be allocated to SLMI's shareholders). Lee, Williams

and others caused a motion to be filed, on or about November 27, 2001, seeking an order

approving the sale of such partial, disclosed assets free and clear of liens.

103.      In connection with this motion, it was warranted, on behalf of Lee and the SLMI

Officer Defendants, that SLC, which was to be established in California, would be the purchaser

of the assets and would be competent to enter into and perform all terms provided in a sale of

assets agreement (the "Proposed Partial Sale Of Disclosed Assets") as of the date of closing.

104.    Lee, in a capacity as SLMI's president, signed the proposed agreement relating to the

Proposed Partial Sale Of Disclosed Assets, and Williams, SLMI's Chief Executive Officer,

submitted a declaration in support of the motion seeking an order approving the Proposed Partial

Sale of Disclosed Assets.

105.    The proposed agreement relating to the Proposed Partial Sale of Disclosed Assets

lists the New York offices of Lieberman as the address for SLC.

106.    Despite the warranties made on behalf of Lee, Williams and the SLMI Officer

Defendants, the records of the California Secretary of State do not reflect any such limited

liability company called SLC, LLC as ever being established, rendering false all express

warranties and representations regarding the existence and competence of SLC to serve as a

purchaser of any SLMI assets.

107.    On November 8, 2001, Lee and Lieberman caused POW LLC and QED to be

established as limited liability companies in Delaware.

108.    Upon information and belief, since November 8, 2001, Lee, Lieberman, and certain

of the SLMI Officer Defendants have served as officers and directors of, or have ownership

interests in, POW LLC, or its parent, POW Inc. (which was formed in May 2004), as set forth

below:

        (a)    Lee is a stockholder, director, Chairman and Chief Creative Officer of POW

             Inc.  Lee was a member and manager of POW LLC until May 2004 at which

             time POW Inc. was created, all membership interests in POW LLC were

transferred to POW Inc., and Lee remained a manager of POW LLC thereafter;

(b)    Lieberman is a stockholder, director and Executive Vice President, Business Affairs of POW Inc. Lieberman was a member and manager of POW LLC until May 2004 and Lieberman remained a manager thereafter;

(c)    Champion is a stockholder, director, President and Chief Operating Officer of POW Inc. Champion was an officer of POW LLC and, upon information and belief, a member of POW LLC until May 2004; and

(d)    Kobayashi is a stockholder, Secretary, Assistant Treasurer and Chief Financial Officer of POW Inc. Kobayashi joined POW LLC in December 2001 and was an officer of POW LLC and, upon information and belief, a member of POW LLC until May 2004.

109.    Upon information and belief, Lee, Champion and Lieberman, when considered together, own or control a majority of the outstanding stock in POW Inc.

110.    Through these positions, Lee, Lieberman and the SLMI Officer Defendants have exercised control over POW, and its wholly owned subsidiary QED, since their formation.

111.    Upon information and belief, Lee and Lieberman intended to secretly transfer some of SLMI's assets to QED, and some of SLMI's assets to POW LLC, without notice to SLMI's creditors, SLMI's shareholders or the Bankruptcy Court, in violation of federal bankruptcy law and federal copyright law, and in violation of the express directives in the proposed agreement relating to the Proposed Partial Sale Of Disclosed Assets.

112.        On or about April 11, 2002, the bankruptcy court entered an order approving the

Proposed Partial Sale Of Disclosed Assets to SLC, which had never been formed and was

therefore a non-existing phantom company, in accordance with the requirements and express

directives of the proposed sale of assets agreement related thereto. Indeed, pursuant to the

bankruptcy court's order, the only authorized conveyance of any SLMI assets was to be to SLC,

not any other person or entity, on the terms and conditions specifically set forth in the Order.

113.        Thereafter, upon information and belief, Lee, aided and abetted by Lieberman and the

SLMI Officer Defendants, purported to transfer certain of SLMI's assets, not to the non-existing

SLC, but instead secretly to QED and POW LLC, without any notice to the Bankruptcy Court,

SLMI's creditors and SLMI's shareholders.

114.        This secret transfer violated the automatic stay provisions of the bankruptcy code and

constituted a fraud on the Bankruptcy Court, SLMI's creditors and SLMI's shareholders.

115.        In fact, in an action brought in the United States District Court for the Central District

of California by Lee, POW Inc. (the corporate parent of POW LLC since May 2004) and QED

against SLMI and others, the Honorable Stephen Wilson issued a summary judgment ruling on

January 20, 2009 that POW Inc. and QED had not acquired ownership of any of SLMI's assets

through the SLMI Bankruptcy, and any such purported transfers of assets to POW Inc. and QED

were void as a matter of law.

116.        On or about November 14, 2006, the SLMI Bankruptcy was dismissed because Lee

(and the SLMI Officer Defendants acting through him or in tandem with him) failed to pay

required fees to the United States Trustee's Office and otherwise caused SLMI to fail to perform

its duties as a debtor-in-possession pursuant to the bankruptcy laws. An order of dismissal was

issued by the Bankruptcy Court on November 14, 2006. In 2002, during the SLMI Bankruptcy,

Lee and the SLMI Officer Defendants had caused SLMI to become administratively dissolved

under Colorado law. Therefore, when the SLMI Bankruptcy was dismissed on November 14,

2006, there was no board of directors legally authorized to act on behalf of SLMI under Colorado

law.

117.     Due to the actions by Lee, Kobayashi and others in connection with the Colorado

court proceedings, subsequent to the dismissal of the SLMI Bankruptcy, SLMI currently remains

"rudderless" without a board of directors legally authorized to act on behalf of SLMI under

Colorado law, thereby rendering this shareholder derivative action necessary on behalf of SLMI

to enforce SLMI's rights.

**Lee Sues Marvel for Damages Under the Marvel Agreement**

118.     On or about November 12, 2002, Lee sued Marvel in the United States District Court

for the Southern District of New York, Case No. 02-cv-8945 (RWS) (the "Lee-Marvel Suit") for

damages under a profit sharing provision in the Marvel Agreement. In his complaint, Lee alleged

that, through the Marvel Agreement, he had made a conditional assignment of his "rights in his

many world famous and hugely popular characters." (Lee-Marvel Suit, Complaint at ¶ 14.)

119.     Lee attached the Marvel Agreement to his filed complaint in the Lee-Marvel suit.

120.     This was the first time that the Marvel Agreement was publicly disclosed in any

forum.

121.     In its answer to Lee's complaint, dated January 3, 2005, in the Lee-Marvel Suit, (a)

Marvel did not repudiate or deny that Lee created various characters described in the complaint

and (b) did not maintain that Marvel had acquired ownership of any Pre-1994 Characters, or any

other creations, characters and stories created by Lee, except through the November 17, 1998

Marvel Agreement.

122.    In January 2005, the United States District Court for the Southern District of New

York issued a summary judgment ruling in the Lee-Marvel Suit adjudicating the issues presented

to the Court.

123.    On or about April 2005, Lee and Marvel agreed to settle the Lee-Marvel Suit

involving Lee's damage claims under the November 17, 1998 Marvel Agreement.

124.    At the request of Lee and Marvel, the terms of that settlement of the Lee-Marvel Suit

were sealed.

125.    Soon after the announcement of the sealed settlement of the Lee-Marvel Suit, it was

announced in 2005 that Marvel had secured a nonrecourse financing of approximately $525

million in connection with various counterparties.

126.    Upon information and belief, Marvel has realized substantial benefits arising out of,

or in connection with, the Court's summary judgment determination, in January 2005, that

Marvel had acquired ownership of the IP Assets as set forth in the November 17, 1998 Marvel

Agreement, which benefits include, but are not limited to, the $525 million nonrecourse

financing.

**After Dismissal Of SLMI's Bankruptcy, SLMI's Independent
Shareholders Attempt to Enforce SLMI's Rights**

127.    On November 14, 2006, the Bankruptcy Court issued an Order dismissing

SLMI's Bankruptcy Case.

128.     However, Lee and the SLMI Officer Defendants had caused SLMI to become administratively dissolved, during the SLMI Bankruptcy, under Colorado law, thereby causing there to be no board of directors legally authorized to act on behalf of SLMI under Colorado law.

129.     Therefore, upon the dismissal of SLMI's Bankruptcy, certain independent shareholders of SLMI have attempted to seat a board of directors for SLMI to enforce SLMI's rights to the IP Assets.

130.     On November 28, 2006, a SLMI shareholder caused the SLE/SLMI Assignment to be recorded on behalf of SLMI with the United States Copyright Office.

131.     In November 2006, certain, independent SLMI shareholders conducted a special shareholders meeting at which they were elected the controlling officers of SLMI.  They then began using certain of the IP Assets, including select Post-1998 Characters.  This use inures to the benefit of SLMI.

132.     Since 2007, various SLMI shareholders, including Plaintiffs Abadin and Belland, have been seeking to elect a new board of directors for SLMI and to enforce SLMI's rights, inter alia, to the IP Assets under the SLE/SLMI Assignment.

133.     Since 2007, Lee, Kobayashi and, upon information and belief, the SLMI Officer Defendants, Marvel and Perlmutter have caused SLMI to remain "rudderless" by preventing a board of directors from being seated with legal authority to caused SLMI to sue directly in enforcement of its rights.

134.     Since the dismissal of the SLMI Bankruptcy, no competing slate of directors has been proposed by Lee, Kobayashi and others acting in tandem with them.

36

**Defendants' Long-Standing and Continuing Efforts**
**to Divert Funds and Assets Belonging to SLMI**

135.    Upon information and belief, at all times material and relevant herein, defendants had

actual or constructive knowledge of the continuing existence, validity and enforceability of the

SLE/SLMI Assignment and SLMI's rights to the IP Assets as of October 15, 1998.

136.    Upon information and belief, subsequent to the SLE/SLMI Assignment, Lee, Marvel,

POW and QED have used, marketed, licensed, merchandised, promoted, advertised and

otherwise exploited the IP Assets for their own financial benefit, and without the participation,

authority and consent of SLMI.

137.    Such use by Lee, Marvel, POW and QED of the IP Assets, subsequent to the

SLE/SLMI Assignment, inures to the benefit of SLMI.

138.    Lee, Marvel, POW and QED have not paid to SLMI the income, proceeds, royalties

and profits from their use, marketing, licensing, merchandising, promotion, advertising and

exploitation of the IP Assets, or any portion thereof.

139.    Since Lee, Marvel, POW and QED have received income, proceeds, royalties and

profits from their use, marketing, licensing, merchandising, promotion, advertising and

exploitation of the IP Assets, they have a duty to account to SLMI for the same and to pay the

appropriate amount thereof to SLMI.

140.    Subsequent to the SLE/SLMI Assignment, Marvel, POW and QED have paid monies

to or for the benefit of Lee that rightfully belong to SLMI.  Lee has a duty to account to SLMI for

the same and to pay the appropriate amount thereof to SLMI.

37

141.      Upon information and belief, Lee and others with Lee's consent receive royalties,

income, proceeds and profits directly from publishers and others on a variety of projects and

publications, for which Lee has participated as a writer, producer or in some other capacity or

affiliation. Under the SLE/SLMI Assignment, all such royalties, income, proceeds and profits

comprise part of the IP Assets that Lee assigned and conveyed to SLMI and, accordingly, belong

to SLMI.

142.      Since the SLE/SLMI Assignment and continuing thereafter to date, Lee has violated

his fiduciary duties to SLMI, SLMI's creditors and SLMI's shareholders by, inter alia, diverting

SLMI's assets and proceeds thereof to himself and others, without the right to do so.

143.      During the pendency of the SLMI Bankruptcy, Lee, acting in concert with Lieberman

and the SLMI Officer Defendants, purported to transfer assets rightfully belonging to SLMI to

QED & POW.  All such purported transfers were invalid and any interests in the IP Assets that

QED or POW claim to possess rightfully belong to SLMI. Indeed, the United States District

Court for the Central District of California issued a summary judgment ruling on January 20,

2009 determining that Lee, QED and POW acquired no right, title or interest to any SLMI assets

during or through the SLMI Bankruptcy.

**SLMI Hereby Terminates Marvel's Rights To Use And Exploit The IP Assets
Under The Implied Pre-1998 Nonexclusive License For The IP Assets Between
Lee, As Licensor (To Which SLMI Has Succeeded, As Lee's Assignee, Under The
SLE/SLMI Assignment) And Marvel, As Licensee**

144.      Marvel's right to use and exploit the IP Assets created by Lee before October 15,

1998, including the Pre-1994 Characters, and any other creations, characters, stories and

intellectual property created by Lee prior to that date, (a) is not governed by a written agreement

executed by Lee and Marvel prior to October 15, 1998 and (b) is governed by an implied

nonexclusive license entered into, prior to October 15, 1998, between Lee (as the owner of such

IP Assets and as original licensor) and Marvel (as licensee) (the "Implied Pre-1998 Marvel

License").

145.        SLE acquired all of the IP Assets created by Lee before October 15, 1998 as well as

all IP Assets created by Lee on or after October 15, 1998 (including the Post-1998 Characters,

and any other creations, characters, stories and intellectual property created by Lee on or after

October 15, 1998), pursuant to the SLE/SLMI Assignment.

146.        Since July 1999, SLMI is the successor in interest to SLE under the SLE/SLMI

Assignment.

147.        SLMI has stepped into Lee's shoes, as the owner of the IP Assets and the licensor of

all IP Assets covered by the Implied Pre-1998 Marvel License, and SLMI is the current owner of

the IP Assets and the current licensor of all IP Assets covered by the Implied Pre-1998 Marvel

License.

148.        SLMI hereby elects to terminate, effective immediately, any and all of Marvel's rights

of use, exploitation or otherwise for all IP Assets covered by the Implied Pre-1998 Marvel

License, in enforcement of SLMI's rights to the IP Assets under the SLE/SLMI Agreement and

applicable law.

149.        Pursuant to the foregoing, any prospective use or exploitation of any of the IP Assets

by Marvel or by any person or entity claiming any rights to use or exploit any of the IP Assets

by, through or under Marvel, with respect to those IP Assets is covered by the Implied Pre-1998

Marvel License.

## COUNT I:  COPYRIGHT INFRINGEMENT
### (Against Lee, POW and QED)

150.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 -

149 as if fully set forth herein.

151.     Upon information and belief, Lee, a United States citizen, is the original creator of

various works of original authorship created as works made for hire for the benefit of SLMI.

152.     These works made for hire for SLMI contain copyrightable subject matter and were

registered with the United States Copyright Office in the year 2000.

153.     Such registrations include, but are not limited to, the following works relating to the

Accuser, Drifter and Stan's Evil Clone:

     (a)  Title:  The Accuser, characters
          i.  Original Author/Claimant:  SLMI
         ii.  Registration No.:  VA0001045261
       iii.  Date Created:  2000
       iv.  Date of Registration:  June 23, 2000

     (b)  Title:  The Accuser--characters: group 2
          i.  Original Author/Claimant:  SLMI
         ii.  Registration No.:  VA0001068231
       iii.  Date Created:  2000
       iv.  Date of Registration:  September 28, 2000

     (c)  Title:   The Accuser, props.
          i.  Original Author/Claimant:  SLMI
         ii.  Registration No.:  VA0001045262
       iii.  Date Created:  2000
       iv.  Date of Registration:  June 23, 2000

     (d)  Title:   The Accuser--props, background: group 2
          i.  Original Author/Claimant:  SLMI
         ii.  Registration No.:  VA0001068230
       iii.  Date Created:  2000
       iv.  Date of Registration:  September 28, 2000

(e)    Title:  The Drifter, characters
    i.  Original Author/Claimant:  SLMI
    ii.  Registration No.:  VA0001045264
    iii.  Date Created:  2000
    iv.  Date of Registration:  June 3, 2000

(f)    Title:  The Drifter, props, background
    i.  Original Author/Claimant:  SLMI
    ii.  Registration No.:  VA0001045263
    iii.  Date Created:  2000
    iv.  Date of Registration:  June 3, 2000

(g)    Title:   Stan 2.0, Stan's evil clone
    i.  Original Author/Claimant:  SLMI
    ii.  Registration No.:  VA0001060191
    iii.  Date Created:  2000
    iv.  Date of Registration:  August 28, 2000

154.    Upon information and belief, for several original works that were created by Lee for

the benefit of SLMI, Lee, POW, QED or others on behalf of them falsely represented to the

Copyright Office that QED Productions, LLC was the true owner of such works on or about

January 8, 2007.

155.    Upon information and belief, such works of which QED Productions, LLC falsely

claimed ownership include the following titles relating to the Accuser, the Drifter and Stan's Evil

Clone:

(a) Title:   Accuser Artwork
    i.  Authorship on application:  SLMI
    ii.  Claimant:  QED Productions, LLC
    iii.  Registration No.:  VA0001387661
    iv.  Date Created:  2000
    v.  Date of Registration:  January 8, 2007

(b) Title:   Accuser webisodes
    i.  Authorship on application:  SLMI
    ii.  Claimant:  QED Productions, LLC

41

        iii.  Registration No.: PA0001341307
        iv.  Date Created: 2000
        v.  Date of Registration: January 8, 2007

  (c) Title: Drifter artwork
        i.  Authorship on application: SLMI
        ii.  Claimant: QED Productions, LLC
        iii.  Registration No.: VA0001387662
        iv.  Date Created: 2000
        v.  Date of Registration: January 8, 2007

  (d) Title: Stan's Evil Clone website
        i.  Authorship on application: SLMI
        ii.  Claimant: QED Productions, LLC
        iii.  Registration No.: PA0001341306
        iv.  Date Created: 2000
        v.  Date of Registration: January 8, 2007

156.      Upon information and belief, any purported assignment of copyrighted works from SLMI to QED was void.

157.      By reason of the SLE/SLMI Assignment and/or U.S. Copyright laws, SLMI is the valid owner of all right, title and interest in the copyrights that Lee had or controlled on the effective date of the SLE/SLMI Assignment or in the future thereafter, including but not limited to those works set forth in preceding paragraphs relating to the Drifter, the Accuser and Stan's Evil Clone.

158.      The SLE/SLMI Assignment, which is the instrument of transfer of the original works of Lee to SLMI, has been recorded with the United States Copyright Office.

159.      The SLE/SLMI Assignment remains in all respects valid, proper, existing, executory and enforceable.

160.    At all times relevant herein, SLMI, as well as its predecessors in interest, did all things required of it pursuant to the SLE/SLMI Assignment in order to retain ownership of the rights granted therein by Lee.

161.    Upon information and belief, from and including at least in or about January 2007, Lee, POW and QED have infringed and intend to continue to infringe SLMI's copyrights by certain acts, including but not limited to copying, developing, exhibiting, licensing, pursuing syndication, distributing or otherwise exploiting SLMI's copyrighted works or original elements of such works including but not limited to the Drifter, the Accuser and Stan's Evil Clone, in such media as webisodes, macromedia flash-based interactive games, paper-based medium calendars, trading cards, envelopes, greeting cards, and television scripts.

162.    Lee, POW and QED performed these acts without the agreement or consent of SLMI, and they constitute acts of copyright infringement under Title 17 of the United States Code.

163.    As a result of the conduct of Lee, POW and QED, SLMI has suffered damages.

164.    Based upon the foregoing, SLMI demands that Lee, POW and QED account for and pay all damages suffered by SLMI as a result of the infringement and any profits of Lee, POW and QED that are attributable to the infringement and are not taken into account in SLMI's damages (but no less than the statutory minimum).

### COUNT II:  VIOLATION OF LANHAM ACT SECTION 43(a)
(Against Lee, Marvel, POW and QED)

165.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 - 164 as if fully set forth herein.

43

166.    SLMI, as the assignee of Lee, is the owner of all right, title and interest in any and all of Lee's creations and characters including Stan Lee's name, likeness, signature, slogans, symbols, logos, designs and visual representations, as well as any trademarks that Lee had or controlled on the effective date of the SLE/SLMI Assignment.

167.    By at least 2000, SLMI began using in commerce such trademarks and/or service marks, including but not limited to, "Stan Lee Presents," "The Accuser," "Excelsior!" and "The 7th Portal," as well as Stan Lee's name, likeness, signature and visual representations and other marks and symbols in connection with the sale and/or advertisement of its goods or services.

168.    SLMI is also protected by Section 43(a) of the Lanham Act as to all of the marks it has used and for which it has acquired trademark rights through its own use or the use of its licensees, such use inuring to the benefit of SLMI.

169.    SLMI is also protected by Section 43(a) of the Lanham Act as assignee of Lee and owner of all right, title and interest in marks assigned by him pursuant to the SLE/SLMI Assignment.

170.    Upon information and belief, QED Productions, LLC caused the service mark "ACCUSER" to be registered on the principal register of the USPTO on December 23, 2008 (Reg. No. 3,553,108). Upon information and belief, Lee, POW or QED first used this mark in commerce on October 4, 2006 and continues to use such mark.

171.    Upon information and belief, QED Productions, LLC caused the service mark "THE DRIFTER" to be registered on the principal register of the USPTO on December 23, 2008 (Reg. No. 3,552,108). Upon information and belief, Lee and/or POW-QED first used this mark in commerce on October 4, 2006 and continues to use such mark.

44

172.    Upon information and belief, POW! Entertainment, LLC caused the service mark
"STAN LEE PRESENTS" to be registered on the principal register of the USPTO on December
18, 2007 (Reg. No. 3,357,243). Upon information and belief, Lee, POW or QED first used this
mark in commerce on January 9, 2007 and continues to use such mark.

173.    Upon information and belief, Marvel has used and continues to use in commerce
Lee's likeness and visual representations in connection with the advertisement or sale of goods or
services including, but not limited to, the advertisement and sale of magazines including "Stan
Lee Meets Spider-Man" and "Stan Lee Meets Dr. Strange." Upon information and belief, Marvel
began such use on or around September 27, 2006 and on or around October 11, 2006,
respectively, and continues such use.

174.    None of Lee, Marvel, POW or QED has any right of any kind to use the name,
likeness, signature slogans, symbols, logos, designs and visual representations of Stan Lee or any
trademarks including or evidencing the same in commerce.

175.    Including as set forth herein, Lee, Marvel, POW or QED, have used and continue to
use, market, merchandise, promote, advertise, license and exploit the name, likeness, signature
slogans, symbols, logos, designs, visual representations of Stan Lee, as well as trademarks, in
commerce in connection with the sale or advertising of goods or services for their financial
benefit without authority from SLMI.

176.    Including as set forth herein, Lee, Marvel, POW or QED, on or in connection with
goods or services, have used in commerce false designations of origin, false or misleading
descriptions of fact, or false or misleading representations of fact which are likely to cause

45

confusion or mistake or to deceive as to the affiliation, connection or association of Stan Lee,
Marvel, POW or QED with SLMI.

177.    Including as set forth herein, Lee, Marvel, POW and QED, on or in connection with
goods or services, have used in commerce false designations of origin, false or misleading
descriptions of fact, or false or misleading representations of fact which, in commercial
advertisement or promotion, misrepresent the ownership, nature, characteristics, or qualities of
Lee's creations and characters, Stan Lee's name, likeness, signature slogans, logos, designs and
visual representations, as well as any trademarks.

178.    By engaging in the conduct alleged herein, Lee, Marvel, POW and QED have
deprived SLMI of its right to receive the goodwill and value that it otherwise would receive as
the sole and exclusive owner and assignee of any and all rights to Stan Lee's name, likeness,
signature slogans, symbols, logos, designs and visual representations, as well as trademarks.
Lee, Marvel, POW and QED have unjustly and intentionally deprived SLMI of these rights,
interests and benefits for their own financial gain.

179.    As a direct and proximate result of the infringement and other wrongful conduct as
alleged herein, SLMI has been damaged in an amount to be ascertained at trial.

180.    The infringement by Lee, Marvel, POW and QED was willful and intentional, having
had actual and/or constructive notice of the existence of the SLE/SLMI Assignment and
knowledge of facts sufficient to put them on inquiry notice into the possibility that there might be
another assignment superior to any purported rights transferred by reason of the Marvel
Agreement.

181.       Pursuant to 15 U.S.C. § 1117, SLMI is entitled to receive a judgment in an amount

equal to Lee, Marvel, POW and QED's profits, any damages sustained by SLMI and the costs of

the action.

182.       Pursuant to 15 U.S.C. § 1117, SLMI is entitled to receive a judgment for any sum

above actual damages up to three times such amount.

183.       Lee, Marvel, POW and QED acts as alleged have caused injury to SLMI and will

continue to infringe and irreparably injure SLMI unless Lee, Marvel, POW and QED's are

restrained and enjoined by this Court.

## COUNT III: BREACH OF CONTRACT
### (Against Lee)

184.       Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 -

183 as if fully set forth herein.

185.       In October 1998, Lee and SLE entered into the SLE/SLMI Assignment, a valid and

existing contract for valuable consideration.

186.       The assignment effectuated by the SLE/SLMI Assignment has not been terminated

and remains in full force and effect.

187.       At all times relevant to this cause of action, SLMI performed its obligations under the

SLE/SLMI Assignment or was unable to do so due to the actions of Lee.

188.       Pursuant to the terms of the SLE/SLMI Assignment, Lee has an ongoing and

continuing obligation to assign, convey and grant to SLMI, as successor in interest to SLE, all

right, title and interest he had or has in past, present or future IP Assets.

189.       Lee also has an ongoing and continuing obligation to:

47

(a)    refrain from submitting any filings related to the IP Assets with the USPTO
or any governmental or public agency;

(b)    refrain from asserting or assisting others in asserting any claim of ownership
in or rights to past, present or future IP Assets; and

(c)    refrain from making any objection to SLMI's complete and unrestricted right
to use and exploit the IP Assets in any form, manner or medium.

190.    By the acts, transactions and courses of conduct alleged herein, Lee has breached, and
continues to breach, these contractual obligations to SLMI by failing to, among other things,
assign, convey or grant his interests in certain IP Assets to SLMI, provide exclusive, enumerated
services to SLMI or refrain from making governmental filings or otherwise claiming ownership
or rights or assisting others in claiming ownership or rights in the IP Assets.

191.    As a result of Lee's successive breaches of his continuing and ongoing contractual
obligations, SLMI has suffered harm and is entitled to damages for Lee's breach of the
SLE/SLMI Assignment, including all revenues, profits and payments realized from the IP Assets
in an amount to be determined at trial.

192.    SLMI seeks an order of specific performance requiring Lee to comply with his
contractual obligations to take or refrain from taking certain actions.

193.    With regard to those equitable aspects of this cause, SLMI has no adequate remedy at
law.

48

## COUNT IV: TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Marvel, Perlmutter, Arad and Lieberman)

194.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 - 193 as if fully set forth herein.

195.     SLMI, as successor in interest to SLE, has a valid, existing contract with Lee, namely the SLE/SLMI Assignment.

196.     Upon information and belief, Marvel, Perlmutter, Arad and Lieberman knew of the terms and existence of the SLE/SLMI Assignment before or on the date that the Marvel Agreement was executed.

197.     Upon information and belief, at all times relevant to this cause of action Marvel, Perlmutter, Arad and Lieberman also knew that the SLE/SLMI Assignment had not been terminated.

198.     Without reasonable or economic justification or excuse, Marvel, Perlmutter, Arad and Lieberman knowingly and intentionally induced, caused or procured Lee's continuing and successive breaches of the SLE/SLMI Assignment.

199.     Upon information and belief, Lee thereafter did continuously and successively breach the SLE/SLMI Assignment by the following actions:

        (a)     submitting filings related to the IP Assets with the USPTO or governmental or public agencies;

        (b)     asserting or assisting others in asserting claims of ownership in or rights to past, present or future IP Assets; or

49

      (c)    objecting to SLMI's complete and unrestricted right to use and exploit the IP

Assets in any form, manner or medium.

200.      The actions of Marvel, Perlmutter, Arad and Lieberman in causing Lee's breaches of

the SLE/SLMI Assignment constitute tortious interference with contract.

201.      SLMI has suffered damages as the direct and proximate result of the tortious

interference of Marvel, Perlmutter, Arad and Lieberman.

202.      Marvel, Perlmutter, Arad and Lieberman are each jointly and severally liable to

SLMI for the damages it has incurred and will incur, in an amount to be determined at trial.

### COUNT V:  BREACH OF FIDUCIARY DUTY
#### (Against Lee and the SLMI Officer Defendants)

203.      Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 -

202 as if fully set forth herein.

204.      At all times material and relevant to this cause of action, Lee, Champion, Kobayashi

and Williams were directors or officers of SLMI.

205.      As directors of SLMI, Lee and the SLMI Officer Defendants owed fiduciary duties to

SLMI including the duty to act in SLMI's best interests.

206.      Upon information and belief, at all times relevant to this cause of action through at

least November 14, 2006, SLMI reasonably relied upon the skill of Lee and the SLMI Officer

Defendants and reposed trust and confidence in them in their roles as fiduciaries to SLMI.

207.      During the time in which Lee and the SLMI Officer Defendants acted as fiduciaries

to SLMI, they intentionally failed to perform their duties so that SLMI's property and rights were

mismanaged, wasted, and diverted to themselves, or to Marvel, POW or QED, and SLMI's copyright and trademark interests were infringed upon.

208.    During the pendency of the SLMI Bankruptcy proceedings, Lee and the SLMI Officer Defendants also owed fiduciary duties to SLMI and its creditors and shareholders under federal bankruptcy law to (a) truthfully, completely and accurately disclose and describe to the Bankruptcy Court overseeing the SLMI Bankruptcy, any and all potential assets of SLMI that might be subject to administration by the Bankruptcy Court; (b) to provide fair and accurate representations as to the market value of any and all potential assets of SLMI that might be subject to administration by the Bankruptcy Court; (c) to correct any inaccuracies in any previous filings and/or disclosures immediately upon becoming aware of such inaccuracies; (d) to protect the assets of SLMI for the benefit of the creditors and shareholders of SLMI; and (e) to act with candor at all times when making submissions to the Bankruptcy Court, creditors and shareholders of SLMI, the debtor-in-possession.

209.    Upon information and belief, during the SLMI Bankruptcy, Lee and the SLMI Officer Defendants intentionally breached their fiduciary duties by failing to disclose to the Bankruptcy Court the assignment to SLMI of the IP Assets.

210.    Upon information and belief, during the SLMI Bankruptcy proceeding, Lee and the SLMI Officer Defendants breached their fiduciary duties by failing to make adequate disclosures to the Bankruptcy Court.

211.    Upon information and belief, during the SLMI Bankruptcy proceeding, Lee and the SLMI Officer Defendants breached their fiduciary duties by acting for their own personal financial gain and in disregard of the best interests of SLMI, its creditors and its shareholders by,

among other things, establishing POW and QED in order to acquire assets (including certain of the IP Assets) of SLMI at the same time that they represented to the Bankruptcy Court that they would not financially benefit.

212.      By reason of the foregoing, SLMI has suffered damages and great loss, the value of SLMI's stock and dividends has suffered great loss, and SLMI's shareholders have been similarly damaged.

213.      By reason of the foregoing, SLMI is entitled to a judgment against Lee and the SLMI Officer Defendants, in an amount to be determined at trial, for the amounts by which SLMI has been damaged.

### COUNT VI:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Marvel, Perlmutter, Arad and Lieberman)

214.      Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 - 213 as if fully set forth herein.

215.      During November 1998 until on or about November 2006, Lee served as a director and officer of SLMI and owed fiduciary duties to SLMI.

216.      Upon information and belief, during this time, Marvel, Perlmutter, Arad and Lieberman knew that Lee owed fiduciary duties to SLMI as a director and officer.

217.      Upon information and belief, during this time Marvel, Perlmutter, Arad and Lieberman each aided and abetted Lee in breaching his fiduciary duties.

218.      Based upon the totality of his actions, Lee breached his fiduciary duties to SLMI.

219.        Marvel, Perlmutter, Arad and Lieberman, knowingly induced and aided and abetted

Lee in breaching his fiduciary duties by virtue of their wrongful and intentional actions,

participation and substantial assistance.

220.        As a direct result of Lee's breaches of his fiduciary duties to SLMI as aided and

abetted by Marvel, Perlmutter, Arad and Lieberman, SLMI has thereby suffered great loss and

damages, the value of SLMI's stock and dividends has suffered great loss, and its shareholders

have been similarly damaged.

### COUNT VII: FRAUD
### (Against Lee and the SLMI Officer Defendants)

221.        Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 -

220 as if fully set forth herein.

222.        During the pendency of the SLMI Bankruptcy proceedings, Lee and the SLMI

Officer Defendants made misrepresentations of material fact, including but not limited to the

following:

> (a) intentionally misrepresenting the value of SLMI's assets to the Bankruptcy
>
> Court by, among other things, failing to disclose the SLE/SLMI Assignment;
>
> and
>
> (b) secretly and fraudulently transferring assets to QED after representing to the
>
> Bankruptcy Court and SLMI shareholders that they would be transferred to
>
> SLC (which was a non-existing phantom company) in order to get
>
> shareholder approval for the asset transfer.

53

223.      These representations of material fact were false and misleading, as evidenced by the following:

> (a) SLC was never incorporated and was not competent to purchase SLMI's IP Assets;
>
> (b) instead of transferring the IP Assets to SLC (which could not have happened in any event since it was a non-existing phantom corporation), Lee and the SLMI Officer Defendants intentionally and secretly transferred them to QED in violation of the automatic stay imposed in the SLMI Bankruptcy and without notice to SLMI's creditors or shareholders.

224.      At the time that these misrepresentations were made, Lee and the SLMI Officer Defendants knew they were false.

225.      At the time that these misrepresentations were made, Lee and the SLMI Officer Defendants owed fiduciaries duties to SLMI, and SLMI reasonably relied upon Lee and the SLMI Officer Defendants to exercise the normal care and loyalty of fiduciaries.

226.      Plaintiffs were deceived by the misrepresentations of Lee and the SLMI Officer Defendants.

227.      As a direct and proximate result of the misrepresentations made by Lee and the SLMI Officer Defendants, SLMI has suffered great loss and damages, the value of SLMI's stock and dividends has suffered great loss, and its shareholders have been similarly damaged.

## COUNT VIII: CONSTRUCTIVE TRUST
### (Against All Defendants)

228.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 -
227 as if fully set forth herein.

229.    At all times relevant to this cause of action, Lee and the SLMI Officer Defendants
owed fiduciary duties to SLMI.

230.    Based upon the foregoing, defendants have knowingly and wrongfully used,
marketed, licensed, merchandised, promoted, advertised and exploited the IP Assets, of which
SLMI is the rightful and legal owner, or have caused or aided and abetted the same.

231.    All defendants have been unjustly enriched at the expense of SLMI as a result of
defendants' wrongful conduct.

232.    By reason of the foregoing, all defendants have obtained and retained monies under
such circumstances that in equity and good conscience they should not retain.

233.    Equity and justice require that defendants be deemed to hold any and all income,
proceeds and profits from the defendants' use, marketing, merchandising, promoting, advertising
and exploitation of the IP Assets in constructive trust for SLMI.

234.    SLMI seeks the imposition of a constructive trust over the entirety of the income,
proceeds and profits from the defendants' use, marketing, merchandising, promoting, advertising
and exploitation of the IP Assets.

235.    With regard to those equitable aspects of this cause, SLMI has no adequate remedy at
law.

## COUNT IX: ACCOUNTING
### (Against All Defendants)

236.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 -
235 as if fully set forth herein.

237.    At all times relevant to this cause of action, Lee and the SLMI Officer Defendants
owed fiduciary duties to SLMI.

238.    In light of such duties, Plaintiffs reposed trust and confidence in Lee and the SLMI
Officer Defendants.

239.    Contrary to SLMI's ownership rights to the IP Assets, defendants have used,
marketed, licensed, merchandised, promoted, advertised and otherwise exploited the IP Assets
for their own financial benefit and without the participation, authority or consent of SLMI, or
have caused or aided and abetted the same.

240.    Contrary to SLMI's ownership rights in the IP Assets, defendants have not paid to
SLMI the income, proceeds and profits from their use, marketing, licensing, merchandising,
promotion, advertising and exploitation of the IP Assets.

241.    An accounting is necessary to determine the extent to which defendants have
improperly violated SLMI's rights to the IP Assets and to determine the funds properly owed to
Plaintiffs.

242.    SLMI has no adequate remedy at law.

**COUNT X: DECLARATORY JUDGMENTS THAT SLMI IS, AND HAS BEEN, THE
SOLE OWNER OF THE IP ASSETS SINCE OCTOBER 15, 1998, TOGETHER <u>WITH
RELIEF IN ENFORCEMENT THEREOF</u>
(Against All Defendants)**

243.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 -
242 as if fully set forth herein.

244.     Pursuant to the SLE/SLMI Assignment, under which Lee assigned all of his then-
existing, and thereafter created, right, title and interest in and to all IP Assets to SLE, as to whom
SLMI is the current successor in interest, and/or pursuant to the other grounds established by
SLMI in connection with this action, SLMI respectfully seeks a Declaratory Judgment as
follows:

      (a) Commencing October 15, 1998 and continuing thereafter, SLMI is, and has
           been, the sole owner of all right, title and interest in the IP Assets (the "Sole
           Owner"); and

      (b) SLMI has the right to enforce its Sole Owner rights in the IP Assets in
           accordance with applicable law, including but not limited to:

         i. The rights and remedies afforded to a sole owner of copyrights in, for
            and/or relating to certain "works" governed by the Copyright Act of 1976
            and the Copyright Act of 1909:

         ii. The rights and remedies afforded to a sole owner of trademarks and
            service marks governed by the applicable provisions of the Lanham Act;

         iii. The rights and remedies afforded to a sole owner of the IP Assets under
            applicable federal laws, to the extent that the IP Assets are not governed

57

      by the federal copyright and the trademark and service mark statutes, as

      the case may be; and

iv.  The rights and remedies afforded to a sole owner of the IP Assets under

      applicable state laws, to the extent that such IP Assets are not governed

      by the federal copyright statutes, the federal trademark and service mark

      statutes and other applicable federal laws.

**COUNT XI. DECLARATORY JUDGMENTS THAT SLMI'S RIGHTS TO THE IP ASSETS UNDER THE OCTOBER 15, 1998 SLE/SLMI ASSIGNMENT IS SUPERIOR TO MARVEL'S RIGHTS TO THE IP ASSETS UNDER THE NOVEMBER 17, 1998 MARVEL AGREEMENT, TOGETHER WITH RELIEF IN ENFORCEMENT THEREOF**
**(Against Marvel And Other Applicable Defendants)**

245.      Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 -

244 as if fully set forth herein.

246.      Pursuant to the Marvel Agreement under which Lee conditionally assigned all of his

then-existing right, title and interest in and to the IP Assets to Marvel and/or pursuant to the other

grounds established by SLMI in connection with this action, SLMI respectfully seeks a

Declaratory Judgment as follows:

      (a)     SLMI's right, title and interest in and to the IP Assets under the October 15, 1998

SLE-SLMI Assignment are superior to, and have priority in all respects over, the right, title and

interest, if any, in the IP Assets granted to Marvel under the November 17, 1998 Marvel

Agreement;

      (b)     SLMI's right, title and interest in and to the IP Assets are superior to, and have

priority in all respects over, the right, title and interest, if any, in the IP Assets held by (i) Marvel

58

and (ii) any other person or entity claiming through or under Marvel, including but not limited to,

Marvel, all subsidiaries and affiliates of Marvel, any persons and/or entities in which Marvel may

have an interest and all persons and/or entities in which all subsidiaries and affiliates of Marvel

may have an interest;

(c)    Commencing October 15, 1998 and continuing thereafter until September 8, 2009

(the "Nonexclusive License Period"), the rights of Marvel to use and exploit the IP Assets

have been as a licensee (the "Nonexclusive Licensee") under an implied nonexclusive license

(the "Nonexclusive License") with SLMI (as assignee of, and successor-in-interest to, Lee under

the 10/15/98 Lee-SLMI Assignment;

(d)    Pursuant to Marvel's legal status as a Nonexclusive Licensee of the IP Assets under

the Nonexclusive License during the Nonexclusive License Period, Marvel shall provide an

accounting to SLMI, as the Sole Owner of the IP Assets and/or the licensor under the

Nonexclusive License during the Nonexclusive License Period, regarding all revenues, royalties,

participations, profits, proceeds, income and/or any consideration or value of any kind

whatsoever (collectively, the "Proceeds") generated by, arising from, realized under and/or

otherwise coming into existence in any manner whatsoever in connection with the use and/or

exploitation of the IP Assets in any manner whatsoever (collectively, the "Use-Exploitation"),

including but not limited to the receipt, use, application, allocation, distribution, retention,

encumbrance, pledge, mortgage and/or any disposition of any kind whatsoever (collectively, the

"Disposition") of all Proceeds from the Use-Exploitation;

(e)    Pursuant to Marvel's legal status as a Nonexclusive Licensee of the IP Assets during

the Nonexclusive License Period, Marvel shall remit payment of the Proceeds to SLMI in

59

connection with the Use-Exploitation of the IP Assets during such period, in an amount to be
determined by the Court, and as to which amount SLMI contends that SLMI is entitled to not less
than fifty percent (50%) of such Proceeds under applicable law; and

(f)    Pursuant to SLMI's written election and notice in the Amended Complaint filed with
the Court in this action on September 8, 2009, SLMI validly terminated the duration of the
Nonexclusive License Contract for the IP Assets, effective as of September 8, 2009, in
accordance with applicable law (the "Nonexclusive License Contract Termination") and,
therefore, neither Marvel, nor any person or entity claiming through or under Marvel had any
right to use or exploit the IP Assets effective as of September 8, 2009 or thereafter, provided
however that any use or exploitation of the IP Assets, commencing September 8, 2009 or
thereafter, by any person or entity pursuant to the prior written consent of SLMI (the "SLMI
Consent"), evidencing SLMI Consent to mutually acceptable terms and conditions for third-party
use or exploitation of the IP Assets since September 8, 2009 (the "SLMI Authorized Use-
Exploitation Agreements"), shall be deemed to constitute a legally authorized use or exploitation
of the IP Assets, since September 8, 2009, in accordance with the terms and conditions of the
SLMI Authorized Use-Exploitation Agreements.

## COUNT XII: DECLARATORY JUDGMENTS, IN THE ALTERNATIVE, THAT SLMI IS A JOINT OWNER OF THE IP ASSETS WITH MARVEL, TOGETHER WITH RELIEF IN ENFORCEMENT THEREOF
### (Against Marvel)

247.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 -
246 as if fully set forth herein.

60

248.    In the alternative to the requested declaratory judgments set forth in Counts X and XI

and pursuant to the grounds established by SLMI in connection with this action, SLMI

respectfully seeks a Declaratory Judgment as follows:

(a)    Commencing October 15, 1998 and continuing thereafter, SLMI is, and has been, a

joint owner, along with Marvel, of all right, title and interest in the IP Assets (the "Joint Owner");

(b)    SLMI has the right to enforce its Joint Owner rights in the IP Assets in accordance

with applicable law, including but not limited to:

(i)    The rights and remedies afforded to a joint owner of copyrights in, for and/or

relating to certain "works" governed by the applicable provisions of the Copyright Act of 1976,

as amended the Copyright Act of 1909, as amended, to the extent that the IP Assets are governed

by such federal copyright statutes, as the case may be;

(ii)    The rights and remedies afforded to a joint owner of trademarks and service

marks governed by the applicable provisions of the Lanham Act,

(iii)    The rights and remedies afforded to a joint owner of the IP Assets under

applicable federal laws, to the extent that the IP Assets are not governed by the federal copyright

and trademark and service mark statutes, as the case may be; and

(iv)    The rights and remedies afforded to a joint owner of the IP Assets under

applicable state laws, to the extent that such IP Assets are not governed by the federal copyright

statutes, the federal trademark and service mark statutes and other applicable federal laws;

(v)    Commencing October 15, 1998 and continuing thereafter, SLMI and Marvel

each have joint ownership rights in and to the IP Assets in accordance with applicable law,

provided however that, pursuant to the Court's equitable powers under applicable law, and

61

effective as of the date of entry of a final judgment on the merits in this action and continuing

thereafter (the "Court Directed SLMI-Marvel Joint Ownership Period"):

        (i) such IP Assets shall not be prospectively used or prospectively

exploited by Marvel (or any person or entity claiming through or under Marvel) in the absence of

SLMI's prior written consent evidencing SLMI's written consent to mutually acceptable terms

and conditions for use or exploitation of such IP Assets; and

        (ii) such IP Assets shall not be prospectively used or prospectively

exploited by SLMI (or any person or entity claiming through or under SLMI) in the absence

of Marvel's prior written consent evidencing Marvel's written consent to mutually acceptable

terms and conditions for use or exploitation of such IP Assets;

        (vi) Marvel shall provide an accounting to SLMI, as a joint owner of the Proceeds

from the Use-Exploitation of the IP Assets, for the period commencing October 15, 1998 until

the date of entry of a final judgment on the merits in this action (the "Initial SLMI-Marvel Joint

Ownership Period");

        (vii) Marvel shall remit payment of the Proceeds to SLMI in connection with the

Use-Exploitation of the IP Assets during the Initial SLMI-Marvel Joint Ownership Period, in an

amount to be determined by the Court, and as to which amount SLMI contends that SLMI is

entitled to fifty percent (50%) of such Proceeds under applicable law; and

        (viii) During the Court Directed SLMI-Marvel Joint Ownership Period, all

Proceeds from the Use-Exploitation of the IP Assets shall be equally shared, fifty-fifty, between

SLMI and Marvel as joint owners of the IP Assets in accordance with applicable law.

WHEREFORE, Plaintiffs demand judgment against defendants as follows:

(a) on Count I: for judgment declaring Plaintiffs the copyright owner of such characters as the Drifter, the Accuser and Stan's Evil Clone and for actual damages sustained by SLMI and profits derived from defendants and not less than the minimum statutory damages allowable;

(b) on Count II: for an order restraining and enjoining further acts of infringement and for an amount to be determined at trial, including prejudgment and post-judgment interest, and attorneys' fees and costs;

(c) on Count III: for an order of specific performance and for an amount to be determined at trial;

(d) on Count IV: for an amount to be determined at trial;

(e) on Count V: for an amount to be determined at trial;

(f) on Count VI: for an amount to be determined at trial;

(g) on Count VII: for an amount to be determined at trial;

(h) on Count VIII: the imposition of a constructive trust against all defendants;

(i) on Count IX: an accounting for profits.

(j) on Count X: for a declaratory judgment

(k) on Count XI: for a declaratory judgment

(l) on Count XII: for a declaratory judgment

(m) awarding Plaintiffs their attorneys' fees and costs in prosecuting this action; and

(n) awarding Plaintiffs such other and further relief as this Court deems just and proper.

CHADBOURNE & PARKE LLP

By_____

          Oliver J. Armas
          Dennis C. Hopkins
30 Rockefeller Plaza
New York, New York  10112
(212) 408-5100

          and

   Michael D. Hess, Esq.
   203 E. 72nd St.
   New York, NY  10021
   (917) 207-4405

Attorneys for Plaintiffs
   Jose Abadin, Christopher Belland, Excelsior
   Productions, Inc., Continental Entities, Inc.,
   and Hollywood Holdings Corporation,
   derivatively on behalf of Stan Lee Media,
   Inc.

Dated:  New York, New York
       September 8, 2009

## VERIFICATION

Jose Abadin, pursuant to the provisions of 28 U.S.C. § 1746, declares and verifies as follows:

I am an individual shareholder of Stan Lee Media, Inc. I have brought the within shareholders derivative action, on behalf of Stan Lee Media, Inc., pursuant to my capacity as an individual shareholder.

On behalf of my individual shareholder capacity, I have read the foregoing Verified Second Amended Complaint, know the contents thereof, and the allegations therein are true to my own knowledge, except as to matters stated to be upon information and belief, as to which I believe such allegations to be true. My signature below shall constitute an authorized verification of the foregoing Verified Second Amended Complaint on behalf of my individual shareholder capacity.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct on this 8th day of September 2009.


Jose Abadin

**VERIFICATION**

Christopher Belland, pursuant to the provisions of 28 U.S.C. § 1746, declares and verifies as follows:

I am an individual shareholder of Stan Lee Media, Inc. I am also an officer of and/or authorized signatory for Excelsior Productions, Inc., Continental Entities, Inc. and Hollywood Holdings Corporation (collectively, the "Corporate Shareholders"), each one of which is a corporate shareholder of Stan Lee Media, Inc. I am also an officer of and/or authorized signatory for P.F.P. Family Holdings, L.P., which is a limited partnership shareholder of Stan Lee Media, Inc. (the "LP Shareholder").

I have brought the within shareholders derivative action, on behalf of Stan Lee Media, Inc., pursuant to my capacity as an individual shareholder, as well as on behalf of the Corporate Shareholders and the LP Shareholder.

On behalf of my individual shareholder capacity, as well as on behalf of the Corporate Shareholders and the LP Shareholder, I have read the foregoing Verified Second Amended Complaint, know the contents thereof, and the allegations therein are true to my own knowledge, except as to matters stated to be upon information and belief, as to which I believe such allegations to be true. My signature below shall constitute an authorized verification of the foregoing Verified Second Amended Complaint on behalf of my individual shareholder capacity as well as on behalf of the Corporate Shareholders and the LP Shareholder.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct on this 8th day of September 2009.

_____
Christopher Belland

65 Rockefeller Plaza, New York, NY 10112
tel (212) 408-5100  fax (212) 541-5369

## CHADBOURNE
## & PARKE LLP

Oliver J. Armas
direct tel (212) 408-5399  fax (646) 710-5399
oarmas@chadbourne.com

September 8, 2009

**VIA E-MAIL**

Hon. Paul A. Crotty
United States District Court
Southern District of New York
500 Pearl Street
Room 735
New York, NY 10007

      Re:   Abadin, et al. v. Marvel Entertainment, Inc., et al., No. 09 Civ. 0715 (PAC)

Dear Judge Crotty:

      We, along with Michael D. Hess, recently appeared as new counsel to plaintiffs in the above-referenced case. We submitted letters to Your Honor dated September 1 and September 2, 2009, regarding plaintiffs' intention to submit a Second Amended Complaint. In recognition of the Court deadline to respond to defendants' motions to dismiss, plaintiffs filed today their Second Amended Complaint, a courtesy copy of which will be delivered to the Court tomorrow.

      The Second Amended Complaint responds to the supposed deficiencies in the Amended Complaint that defendants raise in their motions to dismiss, and thus renders those motions moot. Specifically:

- Plaintiffs address the contention that they lack derivative standing by including several original shareholders (a) who owned stock in Stan Lee Media, Inc. ("SLMI") prior to defendants' contention that November 17, 1998 is "the time of the transaction complained of," and (b) who continue to own stock in SLMI today. Plaintiffs do not agree, however, that November 17, 1998 constitutes "the time of the transaction complained of" for the reasons set forth in the Second Amended Complaint.

- Plaintiffs have resolved the contention that SLMI purportedly "abandoned" their trademark rights. Indeed, plaintiffs have alleged, among other things, that the use of the trademarks by defendants inures to the benefit of SLMI under applicable law. Also, it is disingenuous for defendants to have asserted an "abandonment" claim where defendants' improper actions, as alleged in the Second Amended Complaint, prevented SLMI from even being able to use the trademarks over an extensive period, including but not limited to (a) a sham

CHADBOURNE
& PARKE LLP

30 Rockefeller Plaza, New York, NY 10112
tel (212) 408-5100 fax (212) 541-5369

**Hon. Paul A. Crotty**                    -2-                    September 8, 2009

bankruptcy case which defendants used for nearly six years to effectuate
breaches of fiduciary duty and violations of bankruptcy law, and during which
same period of time defendants caused SLMI to become administratively
dissolved by the State of Colorado, such that when the bankruptcy case was
ultimately dismissed on November 14, 2006, there was no board of directors
legally authorized to act on behalf of SLMI, and (b) even after the dismissal of
such bankruptcy case, defendants have continued to breach their fiduciary
duties and have thwarted plaintiffs' efforts to date to seat a board of directors
on behalf of SLMI, thereby rendering this shareholder derivative action
necessary on behalf of SLMI to enforce its rights for the benefit of SLMI's
creditors and shareholders.

• Plaintiffs have resolved the contention that their claims are based on a
  "misreading" of the October 1998 Agreement, between Lee and SLMI by
  alleging that any purported "prerequisites" in the agreement did not apply to
  the assignment of copyrights and trademarks and, in any event, the claimed
  "prerequisites" have been satisfied.

• Plaintiffs have addressed the contention that Stan Lee terminated the October
  1998 Agreement due to a claimed "material breach" by alleging that SLMI
  performed its contractual obligations, including paying Stan Lee.  In any event,
  as set forth in the Second Amended Complaint, the assignment of the
  intellectual property assets is independent of the employment provisions of the
  October 1998 Agreement and, once the intellectual property assignment was
  effectuated, such assignment could not be unilaterally "terminated" by Mr.
  Lee, whether pursuant to federal bankruptcy law, federal copyright law or
  applicable state law.

• Plaintiffs have resolved defendants' claim that the October 1998 Agreement
  was purportedly invalid under California law for various reasons set forth in
  the Second Amended Complaint (including the reasons set forth in the
  preceding bullet point in this letter).

• Defendants' claim that SLMI's Securities and Exchange Commission ("SEC")
  filings are purportedly "silent" with respect to the October 1998 Agreement is
  wrong.  As alleged in the Second Amended Complaint, the October 1998
  Agreement, together with Stan Lee's October 1999 ratification thereof, were
  specifically attached to and incorporated into SLMI's 10-KSB filed with the
  SEC on or about March 20, 2000, and such SEC filing, which encompasses
  hundreds of pages, and which was executed by Stan Lee as Chairman of
  SLMI's Board of Directors, indicates that all of Mr. Lee's intellectual

30 Rockefeller Plaza, New York, NY 10112
tel (212) 408-5100 fax (212) 541-5369

CHADBOURNE
& PARKE LLP

**Hon. Paul A. Crotty**                    -3-                    September 8, 2009

> property rights, as they existed on October 15, 1998, were assigned and
> conveyed to SLMI, together with an assignment of all intellectual property
> assets created by Mr. Lee after that date.

- Defendants argue that the Amended Complaint did not satisfy the pleading
standards set forth in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009). As a threshold matter, courts
applying the Twombly/Iqbal pleading standard have suggested that it does not
impose the level of specificity that plaintiffs contend. See, e.g., R.M. Dev. &
Constr., LLC v. Principle IX Assocs, LLC, No. 09-cv-1666, 2009 WL
1813880, at *3 (E.D.N.Y. Jun. 26, 2009) (while plaintiff's complaint is "terse, .
. . by pleading that a contract existed, that it was breached by the defendants,
and that plaintiff suffered damage as a result, [plaintiff] has pleaded a breach
of contract"). In any event, defendants' claims of pleading deficiencies in a
now superseded complaint have been rendered moot under applicable law, and
the Second Amended Complaint pleads additional and ample allegations which
satisfy the applicable pleading standards.

- Plaintiffs have resolved the contention that plaintiffs' claims are purportedly
barred by the statute of limitations and/or the doctrine of laches based upon
the allegations in the Second Amended Complaint. Indeed, it is submitted that
various claims did not "accrue" under applicable law prior to 2007 when
various shareholders commenced a predecessor lawsuit in this Court which
was dismissed, without prejudice, by Your Honor. Also, with respect to claims
which may have previously "accrued," the allegations in the Second Amended
Complaint indicate that the statute of limitations on such claims has been tolled
pursuant to various statutory and common law tolling doctrines. See also,
generally, Johnson v. Nyack Hosp., 83 F.3d 8, 12 (2d Cir. 2002) ("equitable
tolling" should be applied "as a matter of fairness where a plaintiff has been
"prevented in some extraordinary way from exercising his rights") (citations
omitted). Until November 2006, Mr. Lee and other defendants exercised total
control over SLMI, and concealed their wrongful conduct from
plaintiffs/shareholders, as well as from SLMI's creditors. Also, as alleged in
the Second Amended Complaint, it appears that such defendants may have
perpetrated a fraud on the Bankruptcy Court. Under these circumstances,
courts frequently toll the statute of limitations. See, e.g., Bodner v. Banque
Paribas, 114 F. Supp. 2d 117, 135 (E.D.N.Y. 2000) (applying tolling doctrine
where "the facts show that the defendant engaged in conduct, often itself
fraudulent, that concealed from plaintiff the existence of the cause of action.").

# CHADBOURNE
## & PARKE LLP

30 Rockefeller Plaza, New York, NY 10112
tel (212) 408·5100  fax (212) 541·5369

**Hon. Paul A. Crotty**                    -4-                    September 8, 2009

       Finally, in their motion to dismiss, defendants Lee and Lieberman contend that all claims against them were purportedly released following the settlement of a securities fraud case against certain individual directors and officers. However, any releases given in the settlement of that securities fraud case are wholly irrelevant to this case. First, the stipulation of settlement expressly defined the "released claims" as those "based on or related to [the] purchase or other acquisition of SLMI's common stock . . . ." (Exh. R, Stipulation of Settlement at § V, 1.14.) during a designated period that ended prior to the filing of the SLMI bankruptcy case. Second, SLMI, as an entity, did not release the subject matter of the claims in this case which are based upon SLMI's intellectual property rights. Such releases do not bar the assertion of the intellectual property related claims in this case.

* * *

       As we stated in our letters to the Court on September 1 and 2, 2009,[1] we believe that plaintiffs are permitted to amend their Complaint "as of matter of course" under FRCP 15(a)(1). If Your Honor determines otherwise, however, plaintiffs respectfully request leave from the Court to file the Second Amended Complaint, and in any event, that this letter and the Second Amended Complaint be treated as plaintiffs' response to defendants' motions to dismiss.

       We thank the Court for its consideration.

Respectfully submitted,

Oliver J. Armas

---

[1]   Based on our initial review of the docket we believed that an April 6, 2009 letter attached to Mr. Fleischer's September 2, 2009 letter to Your Honor had not been docketed. We recently determined that the April 6, 2009 letter was attached as an exhibit to one of defendants' motion to dismiss, which motion had been docketed. We apologize to the Court and to counsel for this inadvertent oversight and any confusion that we may have caused.

CHADBOURNE
& PARKE LLP

30 Rockefeller Plaza, New York, NY 10112
tel (212) 408-5100  fax (212) 541-5369

**Hon. Paul A. Crotty**                    -5-                    September 8, 2009

cc:   David Fleischer, Esq. (via e-mail)
      Stephen J. Shore, Esq. (via e-mail)
      Ira Matetsky, Esq. (via e-mail)
      Martin Garbus, Esq. (via e-mail)
      Michael D. Hess, Esq. (via e-mail)