# Exhibit 1

1

```
 1                  - MICHAEL B. WOLK -

 2    UNITED STATES DISTRICT COURT

 3    FOR THE DISTRICT OF COLORADO

 4    ------------------------------ X

 5    STAN LEE MEDIA INC.,              )

 6                   Plaintiff,         )   CIVIL ACTION NO.

 7        -vs-                          )   1:12-cv-o2663-WJM-KMT

 8    THE WALT DISNEY COMPANY,          )

 9                   Defendant.         )

10    ------------------------------ X

11

12    DATE:  June 17, 2015

13    TIME:  11:34 a.m.

14

15              VIDEOTAPED DEPOSITION OF MICHAEL B.

16    WOLK, held at the offices of Weil Gotshal &

17    Manges, 767 Fifth Avenue, New York, New York,

18    pursuant to Subpoena, before Hope Menaker, a

19    Shorthand Reporter and Notary Public of the State

20    of New York.

21

22

23

24

25
```

 1                      - MICHAEL B. WOLK -

 2    TAP-SLMI, LLC.

 3          Q.     I stand corrected.  Thank you.

 4                 Do you have any ownership interest in

 5    TAP-SLMI, LLC?

 6          A.     I do.

 7          Q.     What is that ownership interest?

 8                 MR. MILLSTEIN:  Objection.

 9          A.     I am the managing member of TAP-SLMI,

10    LLC.

11          Q.     Do you have an ownership interest in

12    any other companies that have any relationship

13    with SLMI?

14                 MR. MILLSTEIN:  Objection.

15          A.     No.

16          Q.     When did you first become familiar

17    with SLMI?

18          A.     During the course of 2009.

19          Q.     And how did you become familiar with

20    SLMI?

21          A.     I received a phone call from a

22    company in the commercial litigation funding

23    business.

24          Q.     What company was that?

25          A.     Calunius Capital.

```
 1                  - MICHAEL B. WOLK -
 2   board of directors.
 3        Q.     Okay.  Did you have any involvement
 4   with funding the corporate governance proceedings?
 5             MR. MILLSTEIN:  Objection.
 6        A.     I believe -- I believe some investor
 7   funds were used for the appeal in that matter.  I
 8   had not been involved before then.
 9        Q.     And when you say "investor funds,"
10   what do you mean by that?
11        A.     TAP-SLMI, LLC paid some -- I believe
12   paid some attorney's fees for counsel on the
13   appeal in the corporate governance case.
14        Q.     That would have been approximately
15   2009/2010-ish?
16        A.     It would be.  I don't remember the
17   exact dates of the appeal, but, you know, it --
18   around you know that time.
19        Q.     Okay.
20        A.     Late 2009 or early 2010.
21        Q.     Was that the first litigation or
22   local proceeding that TAP-SLMI funded with respect
23   to SLMI or any of its claimants?
24        A.     You know, I believe around -- I
25   believe around the same time as TAP-SLMI, LLC paid
```

```
 1                      - MICHAEL B. WOLK -

 2    some attorney's fees for the corporate governance

 3    appeal, that, again, in 2000 -- I think goes back

 4    to 2009, some fees were paid to attorneys in

 5    connection with the shareholder derivative -- an

 6    attempted shareholder derivative case in the

 7    Southern District of New York.

 8         Q.     How much approximately did TAP-SLMI

 9    pay in attorney's fees in connection with the

10    Southern District of New York proceeding?

11              MR. MILLSTEIN:  Objection.

12         A.     I don't recall, but I think a

13    significant sum but I don't recall the exact

14    amount.

15         Q.     Was it more than $100,000?

16              MR. MILLSTEIN:  Objection.

17         A.     I would imagine so.

18         Q.     Is it more than $500,000?

19              MR. MILLSTEIN:  Objection.

20         A.     I don't believe so.

21         Q.     How much did TAP-SLMI pay in

22    connection with the appeal of the corporate

23    governance proceeding?

24              MR. MILLSTEIN:  Objection.

25         A.     I don't recall.
```

```
 1                      - MICHAEL B. WOLK -

 2        A.      Yes.

 3        Q.      And who did TAP-SLMI enter into an

 4   agreement with?

 5                MR. MILLSTEIN:  Objection.

 6        A.      The members of the shareholder

 7   faction seeking to validate their election as

 8   members of the board of directors.

 9        Q.      Is that Mr. Abadin and Mr. Thall?

10        A.      Yes, amongst other shareholders.

11        Q.      And who were the other shareholders?

12        A.      Ugh --

13                MR. MILLSTEIN:  Objection.

14        A.      I mean that's information that I

15   can -- I can remember, but it's been Mr. Abadin

16   and Mr. Thall with whom I've been mainly dealing.

17        Q.      Who did TAP-SLMI pay --

18        A.      Well, there's -- there's another --

19   there's another shareholder.  I don't want to be

20   remiss.  I do remember another shareholder being,

21   at that time, Christopher Belland, B-E-L-L-A-N-D,

22   but he's not a member of the board of directors.

23        Q.      Okay.  What law firms did TAP-SLMI

24   pay in connection with the shareholder derivative

25   proceeding in the Southern District of New York?
```

```
 1                  - MICHAEL B. WOLK -

 2      A.     As best I recall, I think it was -- I

 3   think it was the Chadbourne & Parke law firm as

 4   best I recall.

 5      Q.     Did TAP-SLMI enter into any

 6   agreements with the Chadbourne & Parke firm?

 7      A.     Again --

 8             MR. MILLSTEIN:  Objection.

 9      A.     -- TAP-SLMI is a third-party payer,

10   we're not the client; so we don't -- TAP-SLMI, LLC

11   doesn't enter into a client agreement.  But we

12   remitted payment of attorney's fees incurred by

13   our counterparty to its law firm.

14      Q.     Okay.  And did TAP-SLMI remit those

15   fees in accordance with an agreement between

16   TAP-SLMI and its counterparty?

17      A.     Yes.

18      Q.     And who was its counterparty in that

19   case?

20      A.     Again, I believe this shareholder

21   group that was seeking to gain Court approval of

22   their election as members of the board of

23   directors from the corporate governance case and,

24   as best I recall, some members of that group are

25   also simultaneously attempting to pursue an
```

```
 1                    - MICHAEL B. WOLK -

 2   our counterparties.

 3        Q.      Is there a separate agreement between

 4   TAP-SLMI and --

 5        A.      Oh -- and I -- and I --

 6        Q.      I'm sorry.

 7        A.      -- and I congratulate -- I

 8   congratulate you and your firm in that regard.   I

 9   do.

10        Q.      No comments, but thank you.

11               Is there a separate agreement between

12   TAP-SLMI and SLMI?

13               MR. MILLSTEIN:  Objection.

14        A.      As best I recall, once members of the

15   shareholder group were validated as members of the

16   board of directors, as best I recall, acting now

17   as Court-authorized board members, I believe that

18   there -- there are either additional signatures or

19   an addendum saying that the counterparties as of

20   that date would also now include SLMI acting

21   through these Court-authorized board members.

22        Q.      Was -- did that agreement between

23   TAP-SLMI and the share -- the shareholders/SLMI,

24   did that govern the arrangements in this

25   proceeding -- the Colorado proceeding?
```

```
 1                   - MICHAEL B. WOLK -

 2              MR. MILLSTEIN:  Objection.

 3        A.      Yes.

 4        Q.      Did that agreement govern the

 5   proceedings in the Eastern District of

 6   Pennsylvania?

 7              MR. MILLSTEIN:  Objection.

 8        A.      Ostensibly yes.

 9        Q.      And did that agreement cover the

10   proceedings in the Central District of California

11   and the Ninth Circuit?

12              MR. MILLSTEIN:  Objection.

13        A.      Yes.  Yes.

14        Q.      And did it govern the petition for

15   certiorari that was filed following the Ninth

16   Circuit proceeding?

17              MR. MILLSTEIN:  Objection.

18   A.      Yes.

19              MS. SINGER:  Mr. Millstein, can you

20        just wait until I finish the question?  You

21        can object --

22              MR. MILLSTEIN:  You're -- you're

23        pausing and you're -- you're making -- I wait

24        until you pause, and that's --

25              MS. SINGER:  Okay.  All right.
```

```
 1                    - MICHAEL B. WOLK -

 2    that time as well?

 3         A.      That's correct.  That's correct.

 4         Q.      And there was a hundred dollars fee

 5    for filing those articles of reinstatement, right?

 6         A.      I don't recall the amount of the fee.

 7         Q.      You recall there was a fee though,

 8    right?

 9         A.      I imagine there was a fee.

10         Q.      Who paid that fee?

11         A.      I would -- I mean, I would imagine it

12    was paid by TAP-SLMI, LLC as a third-party payer

13    as part of its funding agreement to pay costs and

14    expenses involving legal proceedings.

15         Q.      Did SLMI have any assets at that

16    point?

17         A.      None other than its legal claims,

18    none other than its chooses in action seeking to --

19    seeking to enforce its alleged rights.

20              MS. SINGER:  Let's just for the sake

21         of completeness here, let's mark as Wolk

22         Exhibit 1, which I will hand to the court

23         reporter in just a moment.  It's going to be

24         the Articles of Reinstatement for Stan Lee

25         Media Inc.
```

```
 1                    - MICHAEL B. WOLK -

 2        A.      Not to my knowledge.  Not -- not --

 3   not per the Court order validating who would be on

 4   the board of directors.

 5        Q.      Okay.  Are you familiar with an

 6   individual named Stephen Gordon?

 7        A.      The name sounds vaguely familiar, but

 8   I'm trying to place the context.  The name just

 9   sounds generally familiar, as something that I may

10   have come across as part of TAP-SLMI's due

11   diligence into whether or not to provide funding.

12        Q.      And who performs TAP-SLMI's due

13   diligence?

14                MR. MILLSTEIN:  Objection.

15        A.      Several people.  I was one of them.

16        Q.      Who were the others?

17        A.      People who invested in TAP-SLMI, LLC.

18        Q.      How many other investors are there in

19   TAP-SLMI, LLC.

20                MR. MILLSTEIN:  Objection.

21        A.      I don't see why -- what would (sic)

22   the relevance is of how many investors there are

23   in TAP-SLMI LLC as it pertains to the

24   determination of what assets SLMI may have.

25   Honestly, I don't.  I don't see the connection.
```

```
 1                    - MICHAEL B. WOLK -

 2       Q.      When was TAP-SLMI, LLC formed?

 3       A.      I would guess -- I would guess in

 4   2009.

 5       Q.      Does TAP-SLMI have any activities

 6   other than funding litigation on behalf of or in

 7   connection with SLMI?

 8               MR. MILLSTEIN:  Objection.

 9       A.      Not -- no, not to my knowledge.

10       Q.      Are you familiar with an individual

11   named John Petrovitz, P-E-T-R-O-V-I-T-Z?

12       A.      Generally.  Generally.

13       Q.      Have you had any conversations with

14   Mr. Petrovitz?

15       A.      Not for quite some time.  But again,

16   I believe that's an individual with whom I spoke

17   in connection with due diligence performed by

18   TAP-SLMI, LLC in determining whether or not to

19   invest in providing litigation funding.

20       Q.      And that due diligence was in

21   approximately 2009?

22       A.      Well, that's when it began, yes.

23       Q.      And how long approximately did that

24   due diligence period last?

25       A.      Many months.
```

```
 1                    - MICHAEL B. WOLK -

 2    agreement, what do you mean by that?

 3                    MR. MILLSTEIN:  Objection.

 4        A.      Well, TAP-SLMI, LLC is responsible

 5    for paying attorney's fees owed to counsel

 6    retained by SLMI in the legal proceeding,

 7    including counsel fees that would be incurred on

 8    an appeal.

 9        Q.      So did TAP-SLMI pay any attorneys to

10    file an appeal of that attorney's fees judgment?

11                    MR. MILLSTEIN:  Objection.

12        A.      I mean I would imagine that some

13    amount was paid from TAP-SLMI LLC to attorneys

14    representing SLMI on an appeal.

15        Q.      When you say you would imagine, do

16    you know?

17        A.      I mean I would have to -- the reason

18    I say I imagine, I would have to go over the --

19    the actual bills.  But I imagine because I

20    don't -- I don't think any appellate proceedings

21    would have been pursued by counsel had they not

22    been paid.

23        Q.      And who reviewed the bills of counsel

24    in the Colorado proceeding?

25        A.      Oh, I imagine SLMI reviewed it
```

```
 1                  - MICHAEL B. WOLK -

 2   through their board.  I know that, among others, I

 3   reviewed the bills since we were a third-party

 4   payer of those fees.

 5        Q.     Did the bills go directly to SLMI or

 6   did they go directly to TAP-SLMI?

 7        A.     I don't recall, but I -- they may

 8   have gone to both.

 9        Q.     And were -- did SLMI pay any of the

10   bills in connection --

11        A.     SLMI had no funds or no assets.  SLMI

12   hasn't had any funds or assets apart from the

13   legal claims themselves dating back to the end of

14   SLMI's bankruptcy.

15             That's why -- that's why they came

16   through that firm Calunius Capital that I

17   mentioned, that's why they came looking for

18   assistance.  They believed they had meritorious

19   claims, but no funds or assets or resources to pay

20   counsel, so they needed assistance.  So --

21        Q.     And how did Calunius Capital know to

22   call you?

23        A.     Well, I just --

24             MR. MILLSTEIN:  Objection.

25        A.     -- I -- I know them in the commercial
```

```
 1                    - MICHAEL B. WOLK -

 2    information under my arrangement with the

 3    investors.

 4         Q.    Okay.  So you --

 5         A.    I've tried to answer -- answer

 6    regardless of relevancy objections.

 7               I've tried to answer any question

 8    that I'm not legally prohibited from answering

 9    under my agreements with those investors.

10         Q.    Okay.  I just want to make sure that

11    I understand what the grounds for refusing to

12    answer are.

13               Is it privilege, or is it that

14    there's something in the TAP-SLMI agreement or --

15    well, let me take it back.  Why leave me guessing.

16               What is the basis, just so we have a

17    clear statement on the record, for refusing to

18    answer questions about who the investors are in

19    TAP-SLMI?

20               MR. MILLSTEIN:  It's work product

21          privilege.  And it is also he's under a legal

22          obligation pursuant to the terms of the

23          agreement with the investors not to divulge

24          the names of the investors.

25         A.    And -- and I -- I'd also -- I mean,
```

1                      - MICHAEL B. WOLK -

2          A.     I mean, he represents SLMI, so SLMI's

3     Board members.

4          Q.     SLMI's Board members?  Is there a

5     retention agreement with Bob Chapman?

6          A.     I would imagine there is.

7          Q.     And who is the signatory to the

8     retention agreement?

9          A.     Well, I know that I have a

10    third-party payor agreement under which we're the

11    signatory.  TAP-SLMI LLC is the signatory under

12    the third-party payor agreement.

13         Q.     Who -- who else is a signatory to the

14    TAP-SLMI -- strike that.

15               Who else is a signatory to the

16    third-party payor agreement?

17         A.     I don't recall, off the top of my

18    head, if there are additional signatories or not.

19         Q.     Who are the parties to the SLMI -- to

20    --

21         A.     Well --

22         Q.     -- strike that.

23               Who are the parties to third-party

24    payor agreement?

25         A.     I believe SLMI, and then a third

```
 1                    - MICHAEL B. WOLK -

 2    party, TAP-SLMI LLC, would pay the legal fees

 3    incurred by SLMI, I believe.  I don't have the

 4    document in front of me.  I don't recall.

 5         Q.     Okay.

 6         A.     But I would -- that's usually how it

 7    worked.

 8         Q.     Okay.  I don't have it in front of me

 9    either.  I would love to be able to provide it to

10    you to help refresh your recollection here, and I

11    believe we asked for it.

12                And do I understand you to object to

13    producing that third-party payor agreement?

14         A.     On -- on the grounds that -- yes.

15                MR. MILLSTEIN:  Yes.  Work product.

16                MS. SINGER:  The third-party payor

17         agreement is work product?

18                MR. MILLSTEIN:  Well, let's -- let's

19         consider it.  We don't believe that it fell

20         squarely within any -- any of the requests,

21         or, if it did, it fell within an objection,

22         and we'll revisit that issue.  And if we

23         believe that it should be produced, we'll

24         produce it and -- if it's in possession.  If

25         we can get it, we'll produce it.
```

```
 1                    - MICHAEL B. WOLK -

 2         Q.      Okay.  Is there a third -- a separate

 3    third-party payor agreement with respect to the

 4    Colorado litigation?

 5         A.      I believe that's what we're -- we're

 6    discussing right now.  I believe there is.

 7         Q.      Okay.  And was there a retention

 8    agreement with the Brownstein firm, the local --

 9         A.      I'm sorry?

10         Q.      -- the local counsel in Colorado?

11         A.      I don't recall.  I don't believe so.

12         Q.      Who made the decision to hire

13    Mr. Chapman and the Eisner Jaffe firm?

14         A.      SLMI.

15         Q.      Were you involved in that decision?

16         A.      I was involved in saying that we

17    would agree to pay legal fees to this law firm

18    that you would retain for this litigation.

19         Q.      Okay.  And how much did TAP-SLMI pay

20    to the Eisner Jaffe firm?

21               MR. MILLSTEIN:  Objection.

22         A.      I don't recall.

23         Q.      Is it more than 100,000?

24         A.      I imagine so.

25         Q.      Is it more than 500,000?
```

```
 1                    - MICHAEL B. WOLK -

 2                    MR. MILLSTEIN:  Objection.

 3        A.      I don't know.

 4        Q.      Is it more than $239,940.90?

 5                    MR. MILLSTEIN:  Objection.

 6        A.      I imagine so.

 7        Q.      When was the last time that TAP-SLMI

 8   paid a legal bill from Bob Chapman and either

 9   Eisner Jaffe or any of his law firms?

10                    MR. MILLSTEIN:  Objection.

11        A.      I think late, late of last year.

12        Q.      How much was that --

13        A.      I -- I don't --

14        Q.      -- payment for?

15        A.      I don't recall off the top of my

16   head.  That's also when I became ill late last

17   year.

18        Q.      So, no payments were made -- strike

19   that?

20                    Were any payments made to any lawyers

21   with respect to SLMI litigation by TAP-SLMI after

22   you became ill?

23                    MR. MILLSTEIN:  Just to clarify,

24        you're saying any other litigation, or are

25        you just talking about Colorado right now, or
```

```
 1                    - MICHAEL B. WOLK -

 2     it to SLMI.  I remember seeing some bills as

 3     third-party payor.

 4          Q.     And did TAP-SLMI pay those bills?

 5          A.     To the extent that TAP-SLMI believed

 6     the bills were reasonable and necessary.

 7          Q.     Was there a maximum amount that

 8     TAP-SLMI agreed to pay, with respect to the

 9     Colorado litigation?

10          A.     I don't think there -- there was a

11     specific amount listed.

12          Q.     Were you aware of any caps on the

13     amount that TAP-SLMI would pay, with respect to

14     the Colorado litigation?

15          A.     I'm not aware of a cap, just -- just

16     a general -- that -- that any fees incurred had to

17     be reasonable and necessary.

18          Q.     Approximately how much total was paid

19     in fees for the Colorado litigation?

20          A.     I don't -- I don't recall.

21          Q.     Who would have copies of the bills

22     for the Colorado litigation from the attorneys?

23          A.     Well, to the extent that bills were

24     -- copies of bills were sent to TAP-SLMI as

25     third-party payor, we would have copies, or we
```

1                      - MICHAEL B. WOLK -

2    advice to SLMI's board of directors?

3                      MR. MILLSTEIN:  Objection.

4         A.      I don't give legal advice to SLMI's

5    board of directors.  No.  I don't give legal

6    advice to SLMI's board of directors.  They make

7    their own decisions.

8         Q.      Okay.  So at no point have you given

9    legal advice to SLMI's board of directors?

10        A.      The only thing that I could think of

11   is that I was asked by them to serve as -- or to

12   at least indicate a position as general counsel in

13   contacting media.  So I was -- wasn't giving legal

14   advice.  I was making a statement on behalf of

15   the -- of the SLMI -- SLMI's position in that

16   lawsuit.  And the only other thing I remember is

17   SLMI's board asked me to serve as a -- an

18   authorized representative to attend a deposition

19   so that I could just report back as to what

20   transpired.  But I didn't give legal advice in

21   connection with attending or how that should go.

22        Q.      Okay.  So other than limited period

23   of a couple of days in May 2014 when you made the

24   media statements and attending Mr. Lee's

25   deposition in March of 2013, you've never provided

```
 1                    - MICHAEL B. WOLK -

 2     any legal advice to SLMI's board of advise --

 3     board of directors?

 4          A.     No.  What I would do is I would say

 5     this is the position of TAP-SLMI LLC regarding a

 6     legal fee bill or what your counsel proposes is

 7     the next step in the litigation, and I would

 8     indicate, you know, if we had any objections to

 9     what SLMI's counsel proposed to do next in

10     litigation.

11          Q.     Okay.  So can you give me an example

12     of where SLMI's counsel would propose something

13     and TAP-SLMI would weigh in?

14          A.     Well, we didn't typically weigh in in

15     that fashion.  Counsel would say this is how I

16     would like to prepare a complaint or this is --

17     these are the bases I would like to use to respond

18     to a motion.  And, you know, typically I would

19     recall that we were satisfied with what counsel

20     would recommend as a proposed course of action for

21     its client SLMI and I would say we were satisfied,

22     which meant as a practical matter that we would

23     pay the legal fees incurred.

24          Q.     Were there any -- any situations

25     where TAP-SLMI indicated that it was not satisfied
```

```
 1                      - MICHAEL B. WOLK -

 2    that SLMI brought in the Central District of

 3    California against Stan Lee and Marvel?

 4         A.     SLMI board of directors.

 5         Q.     And was TAP-SLMI -- is it TAP-SLMI

 6    funds that litigation?

 7         A.     We paid counsel fees.

 8         Q.     Did you pay counsel fees in the

 9    proceeding in the Central District of California?

10         A.     For -- for a portion of time.

11         Q.     Who paid the legal fees prior to --

12         A.     That -- that I don't know.

13                (Whereupon, a brief discussion was

14         held off record.)

15         Q.     Do you know who retained the Kohn Law

16    Group, K-O-H-N, to represent --

17         A.     Kohn.   Kohn.

18         Q.     Kohn, sorry.

19                -- the Kohn Law Group to represent

20    SLMI?

21         A.     SLMI.

22         Q.     Did TAP-SLMI have any involvement in

23    that decision?

24         A.     We paid legal fees incurred by SLMI's

25    counsel.
```

```
 1                    - MICHAEL B. WOLK -

 2    would be comfortable with as having expertise and

 3    to pay their legal fees, yeah.

 4         Q.     What's the total amount of legal fees

 5    paid to the Dunnington firm?

 6         A.     I don't know.

 7                MR. MILLSTEIN:  Objection.

 8         A.     I don't know.

 9         Q.     Who authorized the appeal to the

10    Ninth Circuit of the decision in the Central

11    District of California?

12         A.     SLMI's board of directors.

13         Q.     And did TAP-SLMI agree to pay the

14    legal fees for an appeal?

15         A.     We agreed to pay the reasonable --

16    what we thought would be a reasonable cost for the

17    appeal.

18         Q.     And SLMI -- who decided to file a

19    petition for certiorari of the Ninth Circuit's

20    decision?

21         A.     SLMI's board of directors.

22         Q.     And who -- was the Sacks Weston firm

23    one that TAP-SLMI identified as a firm that it

24    would be willing to pay the legal fees for?

25         A.     One of the firms that we would be
```

```
 1                       - MICHAEL B. WOLK -

 2     willing to pay legal fees for.

 3          Q.      And did TAP-SLMI pay the Sacks Weston

 4     firm?

 5          A.      Yes.

 6          Q.      How much?

 7                  MR. MILLSTEIN:  Objection.

 8          A.      That -- that I recall, because that

 9     was relatively recently.  I think it was about

10     $25,000.

11          Q.      And that's $25,000 total for the

12     petition?

13          A.      That's correct.

14          Q.      You mentioned earlier that you knew

15     Mr. Paul had been incarcerated.  Did you have any

16     communications with Mr. Paul while he was in

17     prison?

18                  MR. MILLSTEIN:  Objection.

19          A.      He -- he was -- I think there were

20     one or two occasions where he tried to contact me

21     and I would not accept the call.

22                  I remember receiving message on my

23     machine from someone calling from -- from jail and

24     I did not accept those calls.

25          Q.      Why were you apprising Mr. Paul of
```

1                    - MICHAEL B. WOLK -

2        A.      I imagine so.  He was a significant

3    shareholder.

4        Q.      So, if -- if SLMI had prevailed in

5    any of these litigations, who besides TAP-SLMI

6    would have benefitted financially?

7                MR. MILLSTEIN:  Objection.

8        A.      The SLMI as an entity and SLMI

9    shareholders.

10        Q.      What portion of any recovery did --

11    would TAP-SLMI be entitled to?

12                MR. MILLSTEIN:  Objection.  I don't

13            think he's going to answer.  It's part of the

14            litigation funding agreement.

15        A.      Yeah.  I -- I don't --

16                MR. MILLSTEIN:  I instruct him not to

17            answer on work product.

18        A.      And -- and I don't -- I don't want to

19    answer the question because I believe that it

20    would violate a duty of confidentiality about the

21    terms of the litigation financing agreement that I

22    have with investors.

23        Q.      Okay.  You're an investor, right, in

24    TAP-SLMI?  You personally?

25        A.      I'm an individual investor.

1                    - MICHAEL B. WOLK -

2         Q.      Did anybody at SLMI have any

3    discussions with Mr. O'Donnell?

4         A.      I would imagine so because I -- I

5    believe he may have been an -- an attorney for a

6    shareholder group before TAP got involved.

7         Q.      Did TAP-SLMI pay any of

8    Mr. O'Donnell's legal fees?

9         A.      No.

10        Q.      Are you familiar with Jack Cairl,

11   C-A-I-R-L?

12        A.      I know the name.

13        Q.      Did TAP-SLMI pay any legal fees for

14   Mr. Cairl?

15        A.      No.  That precedes TAP'S involvement.

16        Q.      Do you know who paid Mr. Cairl's

17   legal fees?

18        A.      I don't know.

19        Q.      Do you know who paid Mr. O'Donnell's

20   legal fees?

21        A.      I don't know.

22        Q.      Other than TAP-SLMI, are you aware of

23   any agreements that SLMI had with any person or

24   organization to pay its legal fees?

25        A.      Not during TAP'S -- not since TAP

```
 1                    - MICHAEL B. WOLK -

 2    became involved.

 3        Q.    Are you aware of any person or entity

 4    who might have had an agreement prior to

 5    TAP-SLMI's involvement?

 6              MR. MILLSTEIN:  Objection.

 7        A.    We discussed before I think that

 8    there was a Nevada firm.

 9        Q.    Did TAP-SLMI's agreement obligate

10    TAP-SLMI or anyone else to pay any awards of

11    attorney's fees?

12              MR. MILLSTEIN:  Objection.

13        A.    No.

14              MR. MILLSTEIN:  It was asked and

15        answered.

16        A.    I think I answered that.

17        Q.    Did TAP-SLMI's agreements obligate

18    TAP-SLMI to pay any other judgments?

19        A.    No.

20              MR. MILLSTEIN:  Objection.

21        A.    No.

22        Q.    So, TAP-SLMI was aware that SLMI had

23    no assets, right?

24        A.    Well, TAP was aware that SLMI needed

25    outside funding in order to pursue their claims.
```